UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

BULLION SHARK, LLC,

                                Case No.: **2:23-cv-6529 (NJC) (ARL)**

                Plaintiff,

        -against-

FLIP A COIN BULLION LLC, MATTHEW
FORMAN, CHRISTINA CAPPELLO, JACOB
FORMAN and JOSEPH FORMAN,

                         Defendants.

----------------------------------------------------------------X


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE* MOTION
FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**


**MILMAN LABUDA LAW GROUP PLLC**
Emanuel Kataev, Esq.
Kyle F. Monaghan, Esq.
3000 Marcus Avenue, Suite 3W8
Lake Success, NY 11042-1073
(516) 328-8899 (office)
(516) 328-0082 (facsimile)
emanuel@mllaborlaw.com
kyle@mllaborlaw.com

*Attorneys for Plaintiff*
*Bullion Shark, LLC*

## **TABLE OF CONTENTS**

**TABLE OF AUTHORITIES** ............................................................................................ ii

**PRELIMINARY STATEMENT** ................................................................................... 1

**FACTUAL BACKGROUND** ....................................................................................... 2

**ARGUMENT** ............................................................................................................... 9

      **A.**    **Plaintiff Is Likely To Suffer Irreparable Injury If Injunctive Relief Is Not Granted.** ............................................................................................................. 11

      **B.**    **Bullion Shark Is Likely to Succeed on the Merits of its Claims.** ................ 15
          **1. Violation of Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836** .......... 16

          **2. Computer Fraud & Abuse Act** ................................................................... 18
          **3. Misappropriation** ........................................................................................ 20
          **4. Unfair competition** ..................................................................................... 22
          **5. Tortious interference with business relations & prospective economic advantage** ........................................................................................................ 23
          **6. Unjust enrichment** ..................................................................................... 25
          **7. Breach of contract** ...................................................................................... 26
          **9. Conversion** .................................................................................................. 26
          **10. Breach of Fiduciary Duty** ......................................................................... 27
          **11. Breach of Duty of Loyalty and Violation of the Faithless Servant Doctrine** ............................................................................................................. 29

      **C.**    **The Balance of Hardships Tips Considerably In Bullion Shark's Favor.** . 30

      **D.**    **Granting an Injunction Would Not Harm The Public Interest.** ................ 31

**CONCLUSION** ......................................................................................................... 32

## **TABLE OF AUTHORITIES**

**Cases**

16 Casa Duse, LLC v. Merkin,
    791 F.3d 247 (2d Cir. 2015) ............................................................................ 24

A UA Private Equity Partners, LLC v. Solo,
    No. 17-8035, 2018 WL 2684339 (S.D.N.Y. April 5, 2018) ...................................... 10, 17

Ashland Mgt. v. Janien,
    82 NY2d 395 (1993) ..................................................................................... 20

B & M Linen, Corp. v. Kannegiesser, USA, Corp.,
    679 F. Supp. 2d 474 (S.D.N.Y. 2010) ............................................................... 24

Base One Techs., Inc. v. Ali,
    78 F. Supp. 3d 186 (D.D.C 2015) .................................................................... 27

Benihana, Inc. v. Benihana of Tokyo, LLC,
    784 F.3d 887 (2d Cir. 2015) ........................................................................... 32

Broker Genius, Inc. v. Zalta,
    280 F. Supp. 3d 495 (S.D.N.Y. 201 7) .............................................................. 15

Capstone Logistics Holdings, Inc. v. Navarrete,
    2018 WL 6786338 (S.D.N.Y. Oct. 25, 2018) ..................................................... 11, 18

Carvel Corp. v. Noonan,
    3 N.Y.3d 182 (2004)) ................................................................................... 24

Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.,
    598 F.3d 30 (2d Cir. 2010) ............................................................................ 15

City of New York v. Joseph L. Balkan, Inc.,
656 F. Supp. 536 (E.D.N.Y. 1987) ...................................................................... 27

Colavito v. New York Organ Donor Network, Inc.,
    8 N.Y.3d 43 (2006) ..................................................................................... 27

Cont'l Indus. Grp., Inc. v. Altunkilic,
    788 F. App'x 37, 41 (2d Cir. 2019) ................................................................. 28

DeWitt Stern Grp., Inc. v. Eisenberg,
    2013 U.S. Dist. LEXIS 78598 (S.D.N.Y. June 4, 2013) ......................................... 11

Eagle Comtronics, Inc. v. Pico, Inc.,
  89 A.D.2d 803, 453 N.Y.S.2d 470 (4th Dept. 1982) ...................................................... 21

Ecolab, Inc. v. Paolo,
  753 F Supp 1100 (E.D.N.Y. 1991)................................................................................... 22

Estee Lauder Cos. v. Batra,
  430 F. Supp. 2d 158 (S.D.N.Y. 2006).......................................................................... 12, 13

ExpertConnect, L.L.C. v. Fowler,
  2019 U.S. Dist. LEXIS 114931, (S.D.N.Y. July 10, 2019) ............................................. 21

Fairfield Cty. Med. Ass'n v. United Healthcare of New Eng.,
  985 F. Supp. 2d 262 (D. Conn. 2013).................................................................................. 9

Fairfield Fin. Mortgage Grp., Inc. v. Luca,
  584 F. Supp. 2d 479 (E.D.N.Y. 2008) ............................................................................. 28

Faiveley Transp. Mahmo AB v. Wabtec Corp.,
  559 F .3d 110 (2d Cir. 2009)............................................................................................. 11

Fine Foods Int'l (New York) v. N. Am. Fine Foods, Inc.,
  No. 99-CV-1062 (ILG), 1999 WL 1288681, at *12 (E.D.N.Y. Nov. 12, 1999) ...........28

FMC Corp. v. Taiwain Tainan Giant Indus. Co., Ltd.,
  730 F.2d 61 (2d Cir. 1984)................................................................................................ 12

Free Country Ltd v. Drennen,
  235 F.Supp.3d 559 (S.D.N.Y. 2016)................................................................................. 16

Front, Inc. v Khalil,
  103 A.D.3d 481 (1st Dept. 2013) ...................................................................................... 28

Garvin GuyButler Corp. v. Cowen & Co.,
  155 Misc. 2d 39 (Sup. Ct. N.Y. Cty. 1992) ...................................................................... 15

Gluco Perfect, LLC v. Perfect Gluco Products, Inc.,
  No. 14-CIV.-1678 (KAM) (RER), 2014 WL 4966102, (E.D.N.Y. Oct. 3, 2014)............ 15

Harris v. Seward Park Hous. Corp.,
  79 A.D.3d 425 (1st Dept 2010).......................................................................................... 26

Henry Schein, Inc. v. Coak,
  191 F. Supp. 3d 1072 (N.D. Cal. 2016) ............................................................................ 10

IME Watchdog, Inc. v. Gelardi,
  No.: 1:22-cv-1032 (PKC) (JRC), 2022 WL 1525486 (E.D.N.Y. May 13, 2022)............. 18

IQ Dental Supply, Inc. v. Henry Schein, Inc.,
    924 F.3d 57 (2d Cir. 2019)...............................................................................23, 24

Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,
    58 F.3d 27 (2d Cir. 1995)........................................................................................22

Johnson Controls, Inc. v. A.P.T. Critical Systems, Inc.,
    323 F. Supp. 2d 525 (S.D.N.Y. 2004)....................................................................21

JTH Tax, Inc. v. Sawhney,
    2020 U.S. Dist. LEXIS 217977 (S.D.N.Y. 2020)..................................................18

Katz v. Travelers,
    241 F. Supp. 3d 397 (E.D.N.Y. 2017) ...................................................................23

Kelly v. Evolution Mkts., Inc.,
    626 F. Supp. 2d 364 (S.D.N.Y. 2009)....................................................................21

Kipling Apparel Corp. v. Boading Baigou Xincheng Younuo Trading Co., Ltd.,
    1:18-CV-08333-ALC, 2019 WL 10960397 (S.D.N.Y. June 20, 2019)...........................15

Kirch v. Liberty Media Corp.,
    449 F.3d 388 (2d Cir.2006)....................................................................................23

Lama Holding Co. v. Smith Barney Inc.,
    88 N.Y.2d 413 (1996) ............................................................................................23

Libreros v. Gallo,
    2016 N.Y. Slip Op. 32442, 3 (N.Y. Sup. Ct. 2016) ..............................................28

Long Is. Conservatory, Ltd. v. Jaisook Jin,
    836 N.Y.S.2d 486 (N.Y. Sup. Ct. 2007).................................................................21

Matter of Verizon NY Inc. v. NY State Pub. Serv. Commn.,
    46 Misc. 3d 858 (Sup. Ct., Albany County 2014). ................................................20

Mazzaro de Abreu v. Bank of Am. Corp.,
    525 F. Supp. 2d 381 (S.D.N.Y. 2007)....................................................................25

McKinnon Doxsee Agency, Inc. v. Gallina,
    187 A.D.3d 733, 736 (2d Dept. 2020) ...................................................................28

Medidata Solutions, Inc. v. Veeva Sys.,
    2018 U.S. Dist. LEXIS 199763 (S.D.N.Y. Nov. 26, 2018)...............................16, 17

Mickey's Linen v. Fischer,
      No. 17 C 2154, 2017 WL 3970593 (N.D. Ill. September 8, 2017) .................................. 10

Mission Capital Advisors LLC v. Romaka,
      No. 15-Civ.-5878 WL 11517040 (S.D.N.Y. July 22, 2016)............................................ 10

Mister Softee, Inc. v. Diaz,
      2020 U.S. Dist. LEXIS 118979 (E.D.N.Y. July 2, 2020).......................................... 11, 13

N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.,
      883 F.3d 32 (2d Cir. 2018)............................................................................................... 9

NextG Networks of New York, Inc. v. City of New York,
      2004 WL 2884308 (S.D.N.Y. Dec. 10, 2004) ................................................................ 12

N. K. Intl., Inc. v. Dae Hyun Kim,
      68 A.D.3d 608 (1st Dept. 2009) ..................................................................................... 28

North Atlantic Instruments, Inc. v. Haber,
      188 F.3d 38 (2d Cir. 1999)............................................................................................. 12

Plaza Motors of Brooklyn, Inc. v. Bogdasarov,
      No.: 1:21-cv-6545 (KAM), 2021 WL 5630910 (E.D.N.Y. Dec. 1, 2021)...................... 18

Pokoik v. Pokoik,
      115 A.D.3d 428 (1st Dept 2014) .................................................................................... 27

Popat v. Levy,
      328 F. Supp. 3d 106 (W.D.N.Y. 2018)........................................................................... 23

RKL Inc., d/b/o Roll-Krafi v. Grimes,
      177 F. Supp. 2d 859 (N.D. Ill. 2001).............................................................................. 17

RSSM CPA LLP v. Bell,
      2017 N.Y. Misc. LEXIS 40 (N.Y. Sup. Ct. Jan. 6, 2017) ............................................. 28

S. Nassau Control Corp. v. Innovative Control Mgmt. Corp.,
      1996 U.S. Dist. LEXIS 22603 WL 496610 (E.D.N.Y. June 20, 1996) .......................... 11

Salinger v. Colting,
      607 F.3d 68 (2d Cir. 2010)....................................................................................... 11, 13

Scherer Design Group, LLC v. Schwartz,
      2018 U.S. Dist. LEXIS 125644 (D.N.J. July 26, 2018)................................................. 15

SEC v. Citigroup Global Markets, Inc.,
      673 F.3d 158 (2d Cir. 2012)........................................................................................... 31

Sharma v. Skaarup Ship Mgmt. Corp.,
    916 F.2d 820 (2d Cir.1990)............................................................................. 23

Singas Famous Pizza Brands Corp. v. N.Y. Adver. LLC,
    468 F. App'x. 43 (2d Cir. 2012) ............................................................... 11, 12

State of New York v. Seventh Regiment Fund,
    98 N.Y.2d 249 (2002) ................................................................................... 27

Testing Servs., N.A. v. Pennisi,
    443 F. Supp. 3d 303 (E.D.N.Y. 2020) ........................................................... 21

United States v. Gasperini,
    894 F3d 482 (2d Cir. 2018)............................................................................ 20

Upwork Glob. Inc. v. Fan Lian,
    No. 19-CIV.-7719 (NC), 2021 WL 1080526 (N.D. Cal. Mar. 2, 2021) ........................... 19

Winter v. Nat. Hus. Def Council, Inc.,
    555 U.S. 7 (2008)............................................................................................ 9

World Wide Commc'ns, Inc. v. Rozar,
    No. 96-CIV.-1056 (MBM), 1997 WL 795750 (S.D.N.Y. December 30, 1997) .............. 23

**Statutes**

18 U.S.C. § 1030................................................................................................... 18, 19

18 U.S.C. § 1831....................................................................................................... 16

18 U.S.C. § l 836........................................................................................................ 8

18 U.S.C. § 1839................................................................................................ 12, 14, 15

18 U.S.C. § 2510....................................................................................................... 17

18 U.S.C. § 2511....................................................................................................... 17

18 U.S.C § 2520.................................................................................................... 9, 17

Fed. R. Civ. P. 65 ....................................................................................................... 1

**PRELIMINARY STATEMENT**

This case involves the theft of Plaintiff's confidential information and trade secrets by Defendants, former employees of Plaintiff.  Defendants' scheme was achieved by stealing and misappropriating Plaintiff's confidential and proprietary master list of qualified leads and customers to put Plaintiff out of its business and steal customers and suppliers for their newly created business in violation of employment agreements forbidding same and in violation of the law. Defendants' illegal scheme further consisted of Defendants logging in to Plaintiff's customer relationship management system after their separation from employment. The abominable conduct of the Defendants must be put to a stop.

This Memorandum of Law is respectfully submitted by Plaintiff, Bullion Shark, LLC (hereinafter the "Plaintiff" or "Bullion Shark") in support of its urgent need for an *ex parte* temporary restraining Order ("TRO") and preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure, the Defend Trade Secrets Act ("DTSA"), and Computer Fraud & Abuse Act ("CFAA"), issued against Defendants to immediately stop their hijacking and theft of Bullion Shark's confidential information and trade secrets, customer information, and employees, all of which they stole from Plaintiff in violation of their contractual and common law duties to Plaintiff.

It took Bullion Shark years of blood, sweat, and tears to create, develop, and establish its confidential and proprietary list of qualified leads and existing customers, which Defendants benefitted from and have now stolen while working with Plaintiff under an agreement that forbids them from disclosing or utilizing this confidential information in any manner.  Without this Court's immediate intervention, the irreparable harm to Bullion Shark and its current employees will continue unabated and without remedy.

## FACTUAL BACKGROUND

Reference is respectfully made to the sworn declaration of Nicholas Adamo ("Adamo"), the founder and Chief Executive Officer of Plaintiff, which is detailed and accompanied by Exhibits A through K, as well as the complaint in support of this application.

Each of the foregoing are incorporated by reference herein, with a short synopsis below.

Bullion Shark has operated in the highly competitive field of collectible trading, including rare coins and precious metals since its incorporation in May of 2014. Bullion Shark was formed by Adamo, an avid collector of all collectibles, in order to help facilitate others enjoyment of collectibles and as a way for Adamo to fund his way through college and law school.

Adamo, with the help of his brother, Andrew Adamo ("Andrew") grew Bullion Shark from a two-person business into a business that employees, on average, fifteen (15) employees.

Furthermore, Adamo and Andrew have successfully built up Bullion Shark through the relationships that they built with Bullion Shark's customers and through expensive and time-consuming advertisement, attendance at various trade shows throughout the country, and through their marketing strategy to customers throughout the United States. Through these efforts, Bullion Shark was able to develop and maintain a highly confidential list of qualified leads and existing customers.

For nearly a decade, Bullion Shark's founder built relationships in the rare coin and vintage metal industry. Since its inception, Bullion Shark has invested in, developed, created and fostered its customer list through its sales, marketing and advertising efforts, which has costs Plaintiff substantial time, effort and money to do so over the last near-decade.

Eventually, Bullion Shark was in a position to hire more employees, including sales representatives and administrative staff. In order to help facilitate sales and to help its sales

2

representatives, Bullion Shark would provide its sales representatives with the contact information of a portion of its confidential list of qualified leads and existing customers. In fact, a majority of all sales representatives sales come from that list of qualified leads and existing customers. As such, Bullion Shark requires that all of its employees sign an employment agreement which contains, *inter alia*, a provision designating its list of qualified leads and existing customers, its list of suppliers, its customer sales histories, Bullion Shark's pricing and cost data, Bullion Shark's analytical business data and business data, strategies and operations as confidential protected information ("CPI").

Each employee acknowledges and agrees in writing that Bullion Shark's CPI contains valuable, special and unique assets of Bullion Shark's business that Plaintiff has made sizeable expenditures of time and money in developing and makes all reasonable efforts to protect the CPI's secrecy. Each employee further acknowledges that the CPI constitutes a trade secret of Bullion Shark and each employee agrees that it may not, during the term of his/her employment with Bullion Shark or anytime thereafter, directly or indirectly use, divulge, furnish or make available other than to Bullion Shark, any of Bullion Shark's CPI.

Likewise, Bullion Shark goes through great lengths to protect its CPI. Bullion Shark's CPI is encrypted in a customer relationship management ("CRM") system and is password protected. The CRM also requires a two-factor authentication to access. The passwords to the CPI contained within the CRM are changed daily at the end of every day by Adamo and Andrew.

Furthermore, Bullion Shark limits the employees that can view the encrypted CPI; Bullion Shark's sales representatives are provided only a selection of the qualified leads and existing customers so that its sales representatives are not working on the same customer. Only Bullion Shark's administrative employees have access to the entire CPI in order to fulfill their job duties.

3

However, the administrative employees do not have unfettered access to the CPI. Instead, the administrative employees are only able to access the CPI while they are logged in to Bullion Shark's server.

Moreover, the CRM that Bullion Shark utilizes to maintain its CPI is a relatively unknown CRM system called Sales Binder. Bullion Shark has expended thousands of dollars to install, monitor, tailor and customize the Sales Binder CRM system in order to satisfy Bullion Shark's needs, including implementing a sales tax feature and automatically recording commissions information for payroll purposes with respect to its sales team.

Bullion Shark also provides its sales representatives with a comprehensive training program in order to help teach its sales team the ins and out of dealing with rare coins and to mentor sales representatives on how to generate sales. This training program includes a virtual training program that Adamo personally created, including videos and written instructions on how to sell, how to close, how to talk to customers and how to become knowledgeable in coins. (the "Bullion Shark Training Program"). The Bullion Shark Training Program also includes daily and weekly trainings, which include product training, learning information relating to the history and mintages of coins, skill milling (i.e. mock-sales interactions) to learn how to overcome objections from customers, and learning how to determine whether a customer is a qualified prospect. The Bullion Shark Training Program is confidential and propriety to Bullion Shark.

On or about January 11, 2022, Bullion Shark hired Defendant Matthew Forman (hereinafter "Matthew") as a sales representative. Matthew did not have *any* prior experience in selling rare coins nor precious metals prior to joining Bullion Shark. As part of his employment with Bullion Shark, he signed a restrictive covenant agreement, wherein he agreed not to divulge any of Bullion Shark's CPI both while he was employed by Bullion Shark and anytime thereafter,

as Matthew had agreed that the CPI was confidential, proprietary and constituted a trade secret of Bullion Shark. The restrictive covenant agreement further provides that Matthew would not engage in solicitation of Plaintiff's customers or employees and agreed not to compete with Plaintiff for a period of two (2) years following employment.

Thereafter, Matthew was provided the Bullion Shark Training Program in order to build up Matthew's knowledge of rare coins and vintage metals, which Matthew did not have prior to his employment with Bullion Shark. Plaintiff provided this training to Matthew, as well as provided Matthew with a select group of qualified leads and existing customers from its CPI in order for Matthew to facilitate sales. Notably, Matthew did not have unfettered access to Bullion Shark's CPI.

In or about February 2022, Bullion Shark hired Defendant Christina Cappello (hereinafter "Cappello") as an administrative assistant. As an administrative assistant, Cappello was responsible for processing credit cards, applying payments to invoices and providing customer service to Bullion Shark's customers. As such, Cappello was privy to Bullion Shark's customer list. Just as with Matthew, Cappello signed an identical restrictive covenant agreement, which bound Cappello to the same requirements as Matthew. Eventually, in or about the Fall of 2022, Cappello was promoted to Shipping Manager. As the Shipping Manager, Cappello was provided access to all of Bullion Shark's CPI while she was logged in to Bullion Shark's system since she was responsible for fulfilling orders, shipping orders, handling and opening packages from suppliers, maintaining inventory and client and supplier data. Cappello was only provided this information because she had signed the restrictive covenant agreement. Moreover, Matthew and Cappello were and are involved in a consensual romantic relationship with each other.

On or about July 5, 2022, Bullion Shark hired Jacob Forman (hereinafter "Jacob") as a Sales representative. Just as with Matthew and Cappello, Jacob signed an identical restrictive covenant agreement, which bound Jacob to the same requirements as Matthew and Cappello to maintain the confidentiality of Bullion Shark's CPI.

On or about Fall 2022, Jacob left his employment with Bullion Shark of his own volition in order to, as he claimed, go back to school. At the time that Jacob left his employment with Bullion Shark, it had no reason to believe that Jacob had engaged in any nefarious behavior.

On or about August 11, 2023, Matthew and Cappello approached Adamo to inform him that they would both be resigning from employment with Bullion Shark. Matthew and Cappello had informed Adamo that their resignations were due to vague and unspecified familial issues. At that time, Bullion Shark had no reason to believe that Matthew or Cappello had engaged in any nefarious behavior.

However, Matthew, Cappello and Jacob had engaged in nefarious behavior at that time. On August 11, 2023, Matthew, Cappello and Jacob, along with Matthew's and Jacob's father, Joseph Forman ("Joseph") (Matthew, Cappello, Jacob and Joseph collectively "Individual Defendants") had formed and incorporated the Corporate Defendant, Flip a Coin Bullion, LLC ("Flip a Coin" or the "Corporate Defendant") (Individual Defendants and Corporate Defendant collectively "Defendants") in the State of Florida.

As a result, to protect its business, and following the lack of an appropriate response to a cease-and-desist letter, Bullion Shark initiated the instant lawsuit against Defendants.

While one might believe that by filing the instant lawsuit, they would cease their nefarious and illegal retention and utilization of Plaintiff's CPI, Defendants were not deterred.

On November 9, 2023, Adamo was contacted by numerous Bullion Shark customers to inform him that Matthew, Jacob, and others at "Flip a Coin" were reaching out to them to attempt to sell rare coins and vintage metals. One customer that contacted Adamo on November 9, 2023 was Harry Boltz (hereinafter "Mr. Boltz"). Mr. Boltz was one of Bullion Shark's customers whom Adamo regularly interacted with and sold products to. Adamo sourced him as a lead by building and fostering a client relationship with Mr. Boltz after he purchased products from Bullion Shark's website. Despite being a customer of Bullion Shark, Mr. Boltz confirmed that someone from Flip a Coin has and continues to contact him "maybe three times a week." Mr. Boltz thereafter provided Adamo with a copy of an invoice from a purchase that he made from Flip a Coin. The invoice evidences that Defendants are utilizing the same little known CRM software that Bullion Shark uses. Moreover, if not for Bullion Shark providing Matthew with Mr. Boltz's information to make sales pursuant to the confidentiality provisions in the restrictive covenant agreement, Defendants would not have known to contact Mr. Boltz after their employment with Bullion Shark ceased.

Adamo was also contacted by Guy Foote ("Mr. Foote") on November 9, 2023 to inform him that Jacob had contacted him on behalf of Flip a Coin in order to sell him some coins. Notably, none of the Defendants had interacted with Mr. Foote while they were employed by Bullion Shark. Instead, Mr. Foote was a customer of Aaron Harouche ("Harouche"), another sales representative for Bullion Shark. Neither Matthew or Jacob were provided with Mr. Foote's contact information while they were employed by Bullion. Thus, Defendants should not have known to contact Mr. Foote without misappropriating Bullion Shark's confidential information.

Moreover, Mr. Foote informed Adamo that Flip a Coin was attempting to sell him the Reverse Proof Morgan & Peace Dollar, the same coin that Mr. Foote had just recently purchased from Bullion Shark. Defendants' would not have known that Mr. Foote was interested in the

7

Reverse Proof Morgan & Peace Dollar if not for their misappropriation of Bullion Shark's CPI.

Furthermore, Adamo was contacted by Mark Joslyn ("Mr. Joslyn") on November 9, 2023, to also inform Adamo that Defendants had contacted him to sell him coins. Just as with Mr. Foote, Mr. Joslyn was a customer of Harouche and Defendants did not have any interaction with Mr. Joslyn while they were employed by Bullion Shark.

If Defendants had not interacted with Mr. Foote or Mr. Joslyn during their employment with Bullion Shark, then how did they obtain his contact information? That answer is easily answered, considering that after Cappello's separation of employment with Bullion Shark, she attempted to access Bullion Shark's system. To be clear, Cappello was not authorized, nor would she have had any reason, to access Bullion Shark's system after she had separated from employment with Bullion Shark.

As set forth below, and in the accompanying declaration from Bullion Shark's founder, and CEO Adamo, it is incontrovertible that Defendants illegally and unlawfully misappropriated Bullion Shark's CPI and its customer information, for their personal benefit and to significantly damage Bullion Shark and its employees.

Defendants' perfidious conduct that is causing deep irreparable harm can only be arrested by this Court granting the instant request for a TRO and preliminary injunction to issue.

In fact, Bullion Shark provides evidence in the Declaration of Adamo of numerous customers that have contacted Bullion Shark in the last week to inform Bullion Shark that Defendants have been reaching out to them to attempt to solicit purchases from them. However, as evidenced by the Declaration of Adamo, Defendants would not have known the contact information for these customers but for Defendants illegal taking of Bullion Shark's CPI, which is encrypted and password-protected, as Defendants had little to no interaction with these

customers while they were employed by Bullion Shark. Defendants have engaged in this nefarious and illegal conduct in order to steal customers from Bullion Shark in violation of their contractual agreements and statutory protections.

A denial of this application will only greenlight Defendants' treachery to continue with impunity and allow Bullion Shark to flounder and fail.

As demonstrated below, Bullion Shark has no adequate remedy at law and is entitled to a TRO and a preliminary injunction prohibiting Defendants from maintaining and utilizing Bullion Shark's CPI.

## **ARGUMENT**

In the Second Circuit, the standard for issuance of a TRO is the same as the standard for a preliminary injunction. See Fairfield Cty. Med. Ass'n v. United Healthcare of New Eng., 985 F. Supp. 2d 262, 270 (D. Conn. 2013), aff'd, 557 Fed. Appx. 53 (2d Cir. 2014).

"A party seeking a preliminary injunction must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." See N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc., 883 F.3d 32, 37 (2d Cir. 2018).

Additionally, injunctions are typically warranted only where the balance of equities tips in the moving party's favor and where an injunction is in the public interest. See Winter v. Nat. Hus. Def Council, Inc., 555 U.S. 7, 20 (2008).

For the reasons set forth below, Bullion Shark has satisfied these requirements, in addition to those required for relief under the DTSA and the CFAA, and the Court should grant a TRO and Preliminary Injunction to prevent Defendants from continuing to possess and cause further damage

to Bullion Shark as a result of their unauthorized possession of Bullion Shark's CPI, and its theft of Bullion Shark's customers and employees. Injunctive relief is separately warranted under the DTSA to:

> [P]revent any actual or threatened misappropriation ... on such terms as the court deems reasonable, provided the order does not ( 1) prevent a person from entering into an employment relationship, and that conditions placed on such employment shall be based on evidence or threatened misappropriation and not merely on the information the person knows; or (2) otherwise conflict with … state law prohibiting restraints on the practice of a lawful profession, trade or business; [and] if determined appropriate by the court, requiring affirmative actions to be taken to protect the trade secret.

See 18 U.S.C. § l 836(3)(A)(I); see also, e.g., A UA Private Equity Partners. LLC v. Soto, No. 17-CIV.-8035, (S.D.N.Y. Nov. 6, 2017) (granting plaintiffs ex parte motion for TRO finding that plaintiff will likely succeed on its DTSA claim); Mission Capital Advisors LLC v. Romaka, No. 16-Civ.-5878, 2016 WL 11517040 (S.D.N.Y. Jul. 22, 2016) (same); Henry Schein, Inc. v. Coak, 191 F. Supp. 3d 1072 (N.D. Cal. 2016) (granting a TRO and preliminary injunction preventing a consultant from accessing, using, or sharing confidential data stolen from former employer in violation of the DTSA); Mickey's Linen v. Fischer, No. 17-cv-2154, 2017 WL 3970593 (N.D. III. September 8, 2017) (granting injunctive relief finding that defendant would inevitably use or disclose the plaintiff company's trade secrets if not enjoined, demonstrating likelihood of success).

Bullion Shark seeks to secure the immediate and complete return of its proprietary and confidential trade secret information misappropriated by, and in the possession and control of, Defendants and to prevent Defendants' dissemination or use of such information to unfairly compete against and continue to harm Bullion Shark. Bullion Shark also seeks an Order prohibiting them from communicating with Bullion Shark's current and/or former employees and customers, which it spent significant time, effort, and resources cultivating and sourcing.

**A.  Plaintiff Is Likely To Suffer Irreparable Injury If Injunctive Relief Is Not Granted**.

To establish irreparable injury, one must demonstrate that absent preliminary relief, it will suffer "an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." See Singas Famous Pizza Brands Corp. v. N.Y. Adver. LLC, 468 Fed. Appx. 43, 45 (2d Cir. 2012).  Moreover, a loss that is difficult to replace or to measure is generally irreparable.  See Mister Softee, Inc. v. Diaz, 2020 U.S. Dist. LEXIS 118979 (E.D.N.Y. July 2, 2020) (irreparable injury established where allegations that, as a result of defendant's infringement, business will be diverted, and goodwill likely to be lost) (citing Salinger v. Colting, 607 F.3d 68, 81 (2d Cir. 2010)).

"[T]he use and disclosure of an employer's confidential customer information and the possibility of loss of customers through such usage, constitutes irreparable harm."  See Capstone Logistics Holdings, Inc. v. Navarrete, 2018 WL 6786338, at *33 (S.D.N.Y. Oct. 25, 2018), aff'd in part and remanded in part, 796 Fed. Appx. 55 (2d Cir. Mar. 5, 2020); see also S. Nassau Control Corp. v. Innovative Control Mgmt. Corp., 1996 WL 496610, at * 4 (E.D.N.Y. June 20, 1996) ("The actual or likely use of . . . a former employer's confidential customer information,  and the resulting possible loss of customers, constitutes irreparable harm."); DeWitt Stern Grp., Inc. v. Eisenberg, 2013 U.S. Dist. LEXIS 78598 (S.D.N.Y. June 4, 2013) ("Irreparable harm to an employer results through both the loss of client relationships and customer goodwill from a breach of a non-compete clause, and where an employee has misappropriated trade secrets or confidential customer information, including pricing methods, customer lists and customer preferences").

Indeed, appropriately tailored injunctions can be useful to protect plaintiffs from the effects of misappropriated trade secrets by defendants. See, e.g., Faiveley Transp. Mahmo AB v. Wabtec Corp., 559 F .3d 110, 119 (2d Cir. 2009).  In general, the imminent use of a trade-secret constitutes

irreparable harm. Id. at 118-19 ("A rebuttable presumption of irreparable harm might be warranted in cases where there is a danger that, unless enjoined, a misappropriator of trade secrets will disseminate those secrets to a wider audience or otherwise irreparably impair the value of those secrets"); see also North Atlantic Instruments, Inc. v. Haber, 188 F.3d 38. 49 (2d Cir. 1999); FMC Corp. v. Taiwain Tainan Giant Indus. Co., Ltd., 730 F.2d 61, 63 (2d Cir. 1984) ("[a] trade secret once lost is, of course, lost forever" and as a result, such a loss "cannot be measured in monetary damages."); Estee Lauder Cos. v. Batra, 430 F. Supp. 2d 158, 174 (S.D.N.Y. 2006) ("Even where a trade secret has not yet been disclosed, irreparable harm may be found … upon a finding that trade secrets will inevitably be disclosed ... ).

In considering irreparable harm, the court should consider whether "providing plaintiff with monetary relief will simply not remedy the loss of competitive advantage plaintiff may lose from the alleged misappropriation of its confidential information." See Panorama Consulting Sols., LLC v. Armitage, 2017 WL 11547493, at *1 (D. Colo. June 9, 2017); see also NextG Networks of New York, Inc. v. City of New York, 2004 WL 2884308 (S.D.N.Y. Dec. 10, 2004); Singas Famous Pizza Brands Corp. v. N.Y. Adver. LLC, 468 Fed. Appx. 43, 45 (2d Cir. 2012).

Here, Defendants have unquestionably stolen Bullion Shark's CPI containing its business plan, list of qualified leads and existing customers, customer information and the details concerning Bullion Shark's customers' contacts, pricing, and preferences which Defendants have been and continue to utilize in furtherance of its scheme to illegally steal Bullion Shark's customers. This continued course of conduct has caused and will cause Bullion Shark, along with its sales representatives, including Harouche, irreparable injury as Bullion Shark stands to lose its entire business and customer base that it has spent years building through cultivation of relationships with time, effort, and substantial resources. In fact, Bullion Shark already lost

revenue due to Defendants' theft of its CPI, as Bullion Shark's customers have confirmed that Defendants are selling the exact same coins that Bullion Shark has sold to its customers, thereby taking potential sales away from Bullion Shark. See Mister Softee, Inc. v. Diaz, 2020 U.S. Dist. LEXIS 118979 (E.D.N.Y. July 2, 2020) (irreparable injury established where the plaintiffs alleged that, as a result of defendant's infringement, business will be diverted) (citing Salinger v. Colting, 607 F.3d 68, 81 (2d Cir. 2010)).  Injunctive relief is necessary to obtain the return of and prevent the continued unlawful use of Bullion Shark's CPI.

Additionally, trade secrets can be any "compilation of information which is used in one's business, and which gives [the owner] the opportunity to obtain an advantage over competitors who do not know or use it." See Estee Lauder Cos. v. Batra, 430 F. Supp. 2d 158, 175 (S.D.N.Y. 2006) (summarizing New York law).

The DTSA provides even broader protection:

> ... all forms and types of financial, business, …, technical, [or] economic … information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing ...

See 18 USC § 1839.

Such information is considered a "trade secret" if: "(A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of the information.  See 18 USC§ 1839(3).[1]

---

[1] A number of other factors also bear on whether information is truly a trade secret, including "(1)

Bullion Shark's CPI includes, among other things, customer lists, details about customers (such as the identity of the contact person of each customer and preferred method of communication), methods and procedures of business operations, financial data, Bullion Shark's pricing and sales data, customer purchase history, customer preferences, and similar data.  This is the very information upon which Bullion Shark's entire business is based and certainly constitutes trade secrets under either definition, but unquestionably under the DTSA.

Indeed, this information is the product of a vast amount of time, effort, and resources by Bullion Shark's founder (who has been in this unique business since 2014).

It would be and has proven to be highly useful to a competitor such as the Defendants (whose founders have relied on Plaintiff to source it customers and now seek to benefit from Plaintiff's time, effort and resources after their voluntary separation from employment with Plaintiff) who have utilized this ill-gotten data and information to attempt to put Bullion Shark out of the business. Adamo and Bullion Shark created and fostered these customer relationships that Defendants now seek to use, despite having no right and would not have known if not for their illegal conduct.

Defendants' conduct is truly shocking to the conscience.  The trade secret information has been and is currently being used by Defendants to contact and lure clients away from Bullion Shark to retain the full profit on the revenue generated without paying Bullion Shark, and to provide Defendants with inside information as to the nature and extent of Bullion Shark's operations, including its costs of rare coins and vintage metals. Defendants' unlawful conduct also allows

---

the extent to which the information is known outside of the business: (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of information; ( 4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information: and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." See Estee Lauder Cos. v. Batra at 175.

them to use Bullion Shark's proprietary information for their sole benefit and to the detriment of Bullion Shark and its current employees, which they achieved through improper means.

"[T]he diversion of a company's customers may also constitute irreparable harm." See Scherer Design Group, LLC v. Schwartz, 2018 U.S. Dist. LEXIS 125644 * 23 (D.N.J. July 26, 2018); see also Kipling Apparel Corp. v. Boading Baigou Xincheng Younuo Trading Co., Ltd., 1:18-CV-08333-ALC, 2019 WL 10960397, at *4 (S.D.N.Y. June 20, 2019) (diversion of customers is irreparable and incalculable, thereby warranting injunctive relief); Gluco Perfect, LLC v. Perfect Gluco Products, Inc., No. 14-CIV.-1678 (KAM) (RER), 2014 WL 4966102, at *16 (E.D.N.Y. Oct. 3, 2014) (same, entering preliminary injunction); Garvin GuyButler Corp. v. Cowen & Co., 155 Misc. 2d 39, 45 (Sup. Ct. N.Y. Cty. 1992) ("The prohibition of defendants to utilize … information … will not prejudice defendants but … shall maintain the *status quo*"). Here, where Plaintiff has shown that Defendants have diverted Plaintiff's customers and its customer information, the element of irreparable harm has undoubtedly been met.

**B.  Bullion Shark Is Likely to Succeed on the Merits of its Claims.**

The Second Circuit has adopted a flexible standard with regard to the "likelihood of success" requirement, allowing a party seeking a preliminary injunction to show either a likelihood of success on the merits or "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." See Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 35 (2d Cir. 2010).   To establish a likelihood of success on the merits, a plaintiff "need not show that success is an absolute certainly. [It] need only make a showing that the probability of his prevailing is better than fifty percent." See Broker Genius, Inc. v. Zalta, 280 F. Supp. 3d 495, 509 (S.D.N.Y. 2017) (citation omitted). As discussed below, Bullion Shark will

likely succeed on the merits of its claims for violation of the DTSA, CFAA, misappropriation, unfair competition, tortious interference, unjust enrichment, breach of contract, conversion, breach of fiduciary duty, breach of duty of loyalty, and violation of the faithless servant doctrine.

### 1. Violation of Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836

The DTSA amends the existing federal Economic Espionage Act (the "EEA") (18 U.S.C. § 1831, *et. seq.*) and creates a federal cause of action for the misappropriation of trade secrets used in interstate commerce. The DTSA requires the plaintiff to establish "an unconsented disclosure or use of a trade secret by one who: (i) used improper means to acquire the secret, or (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty." See Free Country Ltd v. Drennen, 235 F.Supp.3d 559, 5 (S.D.N.Y. 2016); see also 18 U.S.C. § 1839(5).

The DTSA's definition of "improper means" includes "misrepresentation, [and] breach or inducement of a breach of a duty to maintain secrecy," but expressly excludes "reverse engineering" and "independent derivation." See 18 U.S. § 1839(6)(A)-(B).

"To state a claim for trade secret misappropriation under the DTSA, a plaintiff must plausibly allege that (1) it possessed a trade secret, and (2) the defendant misappropriated the trade secret." See Medidata Solutions, Inc. v. Veeva Sys., 2018 U.S. Dist. LEXIS 199763, *8 (S.D.N.Y. Nov. 26, 2018). Under the DTSA, the term "trade secret" includes "all forms and types of financial, business, scientific, technical, economic, or engineering information" if (1) "the owner thereof has taken reasonable measures to keep such information secret" and (2) "the information derives independent economic value . . . from not being generally known to, and not being readily

ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." See 18 U.S.C. § 1839(3).

A defendant misappropriates a trade secret under the DTSA (1) when it acquires a trade secret by improper means, or (2) discloses or uses the trade secret without consent. See Medidata Solutions, Inc., 2018 U.S. Dist. LEXIS 199763 at 11.

As set forth above, the material misappropriated by Defendants by their calculated, conniving, and systematic actions fall squarely within the scope of the DTSA. See A UA Private Equity Partners, LLC v. Solo, No. 17-8035, 2018 WL 2684339, *7 (S.D.N.Y. April 5, 2018) (holding that complaint plausibly alleges violation of the DTSA as defendant was alleged to have uploaded plaintiffs trade secrets from her work laptop to her personal cloud-based storage without plaintiffs permission); RKL Inc., d/b/o Roll-Krafi v. Grimes, 177 F. Supp. 2d 859, 875-77 (N.D. Ill. 2001) (finding sufficient evidence of acquisition of theft when employee downloaded or copied trade secrets from work computer to home computer).

First, Matthew, Cappello and Jacob violated their restrictive covenant agreements when directly or indirectly used Plaintiff's CPI either by taking the CPI while they were employed or through Cappello accessing Bullion Shark's CRM after her separation from employment. Matthew, Cappello and Jacob further violated their restrictive covenant agreements when they solicited customers of Bullion Shark to do business with Flip a Coin. Joseph and the Corporate Defendant are also liable for utilizing Bullion Shark's CPI without consent.

Second, the information Defendants misappropriated from Bullion Shark is not readily ascertainable. No one can reverse engineer, or learn by research alone, how Bullion Shark sourced and created its master list with qualified leads and existing customers, made its business model, determined its pricing of coins, or its financial status. Armed with this information, Defendants

have decided to compete with Bullion Shark, and could *and did* create a complete and comprehensive threat to Bullion Shark's business far faster than one that has not engaged in unlawful competition arising out of the theft of Bullion Shark's trade secrets.

Third, Bullion vigilantly safeguarded its data by only allowing Adamo and Andrew – the CEO and President of Bullion Shark, respectively – unfettered access to its CPI by maintaining its encrypted, password-protected CRM. Adamo and Andrew change the password *daily* at the end of each day and are the only persons privy to that new password. Furthermore, Bullion Shark requires its employees to sign a restrictive covenant agreement, which governs the prohibition against dissemination of its CPI, prior to being provided the CPI.

Defendants should not be permitted to exploit and take unfair advantage of Bullion Shark's relationships and goodwill, particularly where those relationships and goodwill were cultivated at Bullion Shark's considerable time and expense and where Defendants have stolen Bullion Shark's CPI through misappropriation. See Capstone Logistics Holdings, Inc. v. Navarrete, 2020 U.S. Dist. LEXIS 110304 (S.D.N.Y. June 23, 2020) (granting injunctive relief on DTSA claims); JTH Tax, Inc. v. Sawhney, 2020 U.S. Dist. LEXIS 217977 (S.D.N.Y. 2020) (same).

Courts routinely grant the relief sought herein in such circumstances. See IME Watchdog, Inc. v. Gelardi, No.: 1:22-cv-1032 (PKC) (JRC), 2022 WL 1525486, at *1 (E.D.N.Y. May 13, 2022); see also Plaza Motors of Brooklyn, Inc. v. Bogdasarov, No.: 1:21-cv-6545 (KAM), 2021 WL 5630910, at *1 (E.D.N.Y. Dec. 1, 2021).

Therefore, Bullion Shark is likely to succeed on the merits of its DTSA claims.

## 2. Computer Fraud & Abuse Act

Section 1030(a)(4) of the CFAA punishes those who (1) knowingly and with intent to defraud (2) accesses a protected computer (3) without authorization or exceed authorized access

and (4) obtain something of value over $5,000.  See 18 U.S.C. § 1030(a)(4).  The statute defines "computer" as "an electronic . . . or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."  See 18 U.S.C. § 1030(e)(1).

"Protected computer" is defined, as relevant here, as one that "is used in or affecting interstate or foreign commerce or communication . . . ."  See 18 U.S.C. § 1030(e)(2)(B).  Where a defendant obtains a password without authorization, he violates the CFAA.  See Upwork Glob. Inc. v. Fan Lian, No. 19-CIV.-7719 (NC), 2021 WL 1080526, at *3 (N.D. Cal. Mar. 2, 2021), report and recommendation adopted sub nom. Upwork Glob. Inc. v. Lian, 19-CIV.-7719 (SI), 2021 WL 1056815 (N.D. Cal. Mar. 19, 2021) ("Upwork's claim for relief under the CFAA is sufficiently pled. … Lian exceeded authorization by obtaining passwords to freelancer accounts and posing as the freelancers on the Upwork platform. … Finally, through unauthorized access, Lian obtained valuable information … that Lian could not have accessed otherwise …").

Here, Plaintiff has established by and through the evidence it submits that Defendants knowingly accessed Plaintiff's CRM system, a computer, without authorization.  Plaintiff has also established that the value of the information Defendants learned and the trade secrets Defendants misappropriated by and through the use of the computer system exceeds well over $1,000,000.00 because Defendants' conduct has caused Plaintiff irreparable harm and Plaintiff has expended over $1,000,000.00 in creating and fostering its master list with qualified leads and existing customers.  It can only be gleaned that based upon Defendant's contact with Mr. Foote and Mr. Joslyn, customers that they did not come into contact with while at Bullion Shark, that Defendants had improperly misappropriated their contact information from Plaintiff's computer system.  Moreover, Defendants would not have any reason to know that Mr. Foote had purchased the

Reverse Proof Morgan & Peace Dollar coins from Bullion Shark previously if they did not steal Bullion Shark's CPI.

The Second Circuit has found that conduct such as Defendants' violates the CFAA.  See United States v. Gasperini, 894 F3d 482, 487 (2d Cir. 2018) ("In this case, Gasperini was found by the jury to have hacked into … computers without permission, thereby gaining access to all of the information stored on those computers. … There is thus no doubt that all of these actions fall within the core meaning of the phrase "accesses a computer without authorization ... and thereby obtains ... information from [a] protected computer" as the … terms are used in § 1030(a)(2)(C)").

Accordingly, Plaintiff is likely to succeed on its CFAA claim.

### 3. Misappropriation

As with the DTSA, Defendants have also misappropriated trade secrets and confidential information under New York law.  A "trade secret" under New York law has been defined as "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors which do not know or use it."  See Ashland Mgt. v. Janien, 82 NY2d 395 (1993); accord Matter of Verizon NY Inc. v. NY State Pub. Serv. Commn., 46 Misc. 3d 858 (Sup. Ct., Albany County 2014).

In determining whether a trade secret exists, New York courts consider the following factors: (a) the extent to which the information is known outside of the owner's business; (b) the extent to which it is known by employees and others involved in the owner's business; (c) the extent of measures taken by the owner to guard its secrecy; (d) the value of the information to him and to his competitors; (e) the amount of effort or money expended by the owner to develop the information; and (f) the ease or difficulty with which the information could be properly acquired

or duplicated by others.  See Eagle Comtronics, Inc. v. Pico, Inc., 89 A.D.2d 803 (4th Dept. 1982);

Long Is. Conservatory, Ltd. v. Jaisook Jin, 836 N.Y.S.2d 486, 486 (N.Y. Sup. Ct. 2007).

As discussed *supra* under the DTSA analysis, the information to which Defendants

obtained access falls squarely within these parameters.  See ExpertConnect, L.L.C. v. Fowler, 2019

U.S. Dist. LEXIS 114931, *18 (S.D.N.Y. July 10, 2019) ("The requirements are similar for

showing a misappropriation of a trade secret under the DTSA and misappropriation under New

York common law… For substantially the same reasons that the Complaint sufficiently pleads a

DTSA claim, the Complaint also states a claim for misappropriation of trade secrets ….").

Further, New York courts also have held that an employer may have a protectable interest

in confidential information even if it does not rise to the level of a trade secret.  See Kelly v.

Evolution Mkts., Inc., 626 F. Supp. 2d 364, 373 (S.D.N.Y. 2009) (granting injunctive relief and

finding that an employer had a protectable interest in its confidential information); Johnson

Controls, Inc. v. A.P.T. Critical Systems, Inc., 323 F. Supp. 2d 525, 537 (S.D.N.Y. 2004) ("even

where the information would not otherwise qualify as a trade secret, the unauthorized physical

taking and exploitation of internal company documents, including detailed customer information

by an employee … is to be enjoined as unfair competition").

Bullion Shark's CPI is afforded protection under New York law, and for the same reasons

that Bullion Shark will prevail on its claim under DTSA, it will also prevail on its claim for

misappropriation of trade secrets and confidential information under New York law.  See Testing

Servs., N.A. v. Pennisi, 443 F. Supp. 3d 303, 342 (E.D.N.Y. 2020) ("…plaintiff has adequately

demonstrated a likelihood of success on the merits of its federal and state law claims for

misappropriation of trade secrets against the individual defendants and, therefore, the branch of its

motion seeking a preliminary injunction enforcing the confidentiality provisions in the individual

defendants' agreements with plaintiff and enjoining them from further misappropriation or dissemination of plaintiff's trade secrets and confidential information is granted").

### 4. Unfair competition

To establish a New York state law unfair competition claim, a plaintiff must allege (1) "misappropriation of the labors and expenditures of another," that is (2) "likely to cause confusion or to deceive purchasers as to the origin of the goods," and (3) "bad faith."  See Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc., 58 F.3d 27, 34-35 (2d Cir. 1995).

Here, Bullion Shark easily establishes a likelihood of success on the merits because, as set forth in the Declaration of Mr. Adamo, customers that did not have any interaction with Defendants have been contacted and have purchased coins from Defendants following Matthew's, Cappello's and Jacob's separation of employment from Bullion Shark.

Plaintiff developed relationships with these customers and went through the rigorous task of starting the business, establishing competitive pricing of the products it sells, attending numerous trade shows, spending millions on advertisement and building its client list one by one to grow Bullion Shark.

This work, including the Plaintiff's pricing, customer purchase history, and its list of qualified leads and existing customers were misappropriated by the Defendants to unfairly compete against Plaintiff. Further, Defendants have directly diverted Plaintiff's business opportunities to themselves using this confidential and proprietary information.

Finally, Defendants' bad faith is self-evident because they engaged in illegal and improper means to obtain the confidential information and trade secrets of Plaintiff. Accordingly, Bullion Shark is likely to prevail on its unfair competition claim.  See Ecolab, Inc. v. Paolo, 753 F Supp 1100, 1111 (E.D.N.Y. 1991) (granting former employer injunctive relief on its unfair competition

claim).

### 5. Tortious interference with business relations & prospective economic advantage

Plaintiff will also prevail on its tortious interference claim.

To state a claim for tortious interference with contract under New York law, one must allege: (1) "the existence of a valid contract between the plaintiff and a third party"; (2) the "defendant's knowledge of the contract"; (3) the "defendant's intentional procurement of the third-party's breach of the contract without justification"; (4) "actual breach of the contract"; and (5) damages. See Kirch v. Liberty Media Corp., 449 F.3d 388, 401-02 (2d Cir.2006) (quoting Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413 (1996).   In addition, the plaintiff must assert, with respect to each defendant, that the defendant'' actions were the "but for" cause of the alleged breach—in other words, that there would not have been a breach but for the activities of the defendant. See Sharma v. Skaarup Ship Mgmt. Corp., 916 F.2d 820, 828 (2d Cir.1990).

"[T]he law requires some factual specificity in pleading tortious interference." See World Wide Commc'ns, Inc. v. Rozar, No. 96-CIV.-1056 (MBM), 1997 WL 795750, at *7 (S.D.N.Y. December 30, 1997) (citation omitted).

Separately, "[u]nder New York law, a plaintiff claiming tortious interference with prospective business relations[2] must show (1) 'the defendant's interference with business relations existing between the plaintiff and a third party,' (2) 'either with the sole purpose of harming the plaintiff or by means that are dishonest, unfair, or in any other way improper.'" See IQ Dental Supply, Inc. v. Henry Schein, Inc., 924 F.3d 57, 69 (2d Cir. 2019) (quotation omitted). "To satisfy

---

[2] "'[T]ortious interference with business relations and tortious interference with prospective economic advantage are not distinct causes of action.'" See Popat v. Levy, 328 F. Supp. 3d 106, 131 n.5 (W.D.N.Y. 2018) (quotation and other citation omitted).  "[N]o matter the term used, the elements are the same." See Katz v. Travelers, 241 F. Supp. 3d 397, 404 (E.D.N.Y. 2017), reconsideration denied, No. 16-CIV.-4389 (ADS) (SIL), 2017 WL 4180012, 2017 U.S. Dist. LEXIS 153275 (E.D.N.Y. Sept. 20, 2017).

the first prong, 'the defendant must direct some activities towards the third party and convince the third party not to enter into a business relationship with the plaintiff.'" Id. (quoting B & M Linen, Corp. v. Kannegiesser, USA, Corp., 679 F. Supp. 2d 474, 485 (S.D.N.Y. 2010).

"[W]here 'the defendant's interference is intended, at least in part, to advance its own competing interests, the claim will fail unless the means employed include criminal or fraudulent conduct.'" Id. (quoting [IQ Dental Supply, Inc., 924 F.3d at 69] (quotation omitted)).  To satisfy the "wrongful means" element of the second prong, a plaintiff must show "'as a general rule,' that 'the defendant's conduct ... amount[ed] to a crime or an independent tort[.]'" See 16 Casa Duse, LLC v. Merkin, 791 F.3d 247, 262 (2d Cir. 2015) (quoting Carvel Corp. v. Noonan, 3 N.Y.3d 182, 190 (2004)).

Here, as set forth in the complaint and the sworn declarations in support of this motion, Plaintiff will easily prevail on its tortious interference claims.

Plaintiff worked to build and maintain its substantial customer base, including a master list of qualified leads and existing customers, for a niche market by separating itself from the competition. Its founder has been in the business for nearly a decade, and safeguarded the vast customer information it obtained by maintaining an encrypted, password protected CRM system.

Defendants decided it is more profitable to steal Plaintiff's CPI than to build up its own customer base, and thus breached the parties' agreement wherein Matthew, Cappello and Jacob agreed to not disclose Plaintiff's CPI or to solicit any customer of Bullion Shark to do business with Flip a Coin.

Defendants were aware of the existence of Plaintiff's contracts with its customers and unlawfully misappropriated Plaintiff's confidential information and trade secrets. Defendants did so, as set forth in the complaint and accompanying declaration, by accessing Plaintiff's systems

24

after their separation of employment.

Without the information they learned from illegally accessing Plaintiff's CRM and in turn, its CPI, which they were contractually required not to otherwise misappropriate, Defendants would not know the necessary specific contact information and preferences of Plaintiff's customers, nor would Defendants know Plaintiff's costs of the coins that Plaintiff was actively selling to its customers, in order to undercut the Plaintiff and remove it from its own business.

Defendants accessed Plaintiff's computer system following their separation from employment, which they had no right to access, thereby satisfying the "wrongful means" element.

Defendants thus intentionally breached their agreements with Bullion Shark not to disclose any of Plaintiff's CPI or to solicit any customers to do business with any other entity other than Plaintiff to misappropriate Plaintiff's confidential information and trade secrets to prevent Bullion Shark from serving the customers it has sourced

As such, Plaintiff has demonstrated a likelihood of success on the merits on its claim for tortious interference.

### 6. Unjust enrichment

"To state a claim for unjust enrichment under New York law, a plaintiff must allege that: (1) the defendant benefited; (2) the benefit was at the expense of the plaintiff; and (3) that equity and good conscience require restitution." See Mazzaro de Abreu v. Bank of Am. Corp., 525 F. Supp. 2d 381, 397 (S.D.N.Y. 2007).

Here, Plaintiff has invested substantial time, money, and effort in developing and maintaining the CPI.

Through brazen acts of misappropriation, the Defendants have used and continue to use Plaintiff's CPI to unfairly compete with Plaintiff and to funnel Plaintiff's business opportunities

away from Plaintiff to Defendants.

As a result of Defendants' use of Plaintiff's CPI, and theft of its customer information and master list of qualified leads and existing customers, Defendants have been enriched at Plaintiff's expense, by – among other things – receiving substantial revenues from the sale of rare coins and vintage metals based on Plaintiff's business concept and pricing models. Defendants are illegally utilizing Plaintiff's CPI without paying Plaintiff any fees or bearing the expense and risk of developing a master list of qualified leads and developing existing customers through the use of Plaintiff's confidential information improperly obtained. Thus, equity and good conscience require restitution to the Plaintiff.

Accordingly, Plaintiff is likely to succeed on its unjust enrichment claim.

### 7. Breach of contract

Plaintiff will also prevail on its breach of contract claim.  The elements of a breach of contract claim include "the existence of a contract, the plaintiff's performance thereunder, the defendant's breach thereof, and resulting damages."  See Harris v. Seward Park Hous. Corp., 79 A.D.3d 425 (1st Dept 2010).

Here, as set forth above, Plaintiff has adequately pled that it had valid restrictive covenant agreements with Matthew, Cappello and Jacob, under which it performed, and which Defendants breached by using and disclosing Plaintiff's CPI, as well as by soliciting Bullion Shark's customers to do business with their newly created business, Flip a Coin, causing Bullion Shark and its employees damages.

As such, Plaintiff is likely to succeed on its breach of contract claim.

### 9. Conversion

Plaintiff will similarly prevail on its conversion claim.

In New York, "conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession." See Colavito v. New York Organ Donor Network, Inc., 8 N.Y.3d 43, 49–50 (2006); see also State of New York v. Seventh Regiment Fund, 98 N.Y.2d 249, 259 (2002).   The two elements of conversion are "(1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." See Colavito, 8 N.Y.3d at 50 (citation omitted).

Here, there is no question that Defendants have obtained Plaintiff's CPI by violating their agreement with Plaintiff. Thus, because Plaintiff has adequately shown that it has a possessory right and interest in its CPI, and that Defendants obtained the CPI in derogation of Plaintiff's rights to maintain the confidentiality thereof, Bullion Shark will succeed on its conversion claim.

### 10. Breach of Fiduciary Duty

Under New York law, the elements of breach of fiduciary duty are "the existence of a fiduciary relationship, misconduct by the other party, and damages directly caused by that party's misconduct." See Pokoik v. Pokoik, 115 A.D.3d 428 (1st Dept 2014).   "The core of the fiduciary duty is the notion of loyalty, and a fiduciary must always act in a good faith effort to advance the interests of those to whom the duty is owed" and must not "use their positions of trust and confidence to further their private interests." See Id. at 429-31.

New York law establishes that an employee-employer relationship is fiduciary.  See City of New York v. Joseph L. Balkan, Inc., 656 F. Supp. 536 (E.D.N.Y. 1987); 52 NYJur2d, "Employment Relations," §228. Under New York Law, even low-level employees owe a fiduciary duty to their employers. See Base One Techs., Inc. v. Ali, 78 F. Supp. 3d 186 (D.D.C 2015); see

27

also Fairfield Fin. Mortgage Grp., Inc. v. Luca, 584 F. Supp. 2d 479 (E.D.N.Y. 2008); Libreros v. Gallo, 2016 N.Y. Slip Op. 32442, 3 (N.Y. Sup. Ct. 2016).

The law is clear that every employee owes a fiduciary duty to toward their employer. See Cont'l Indus. Grp., Inc. v. Altunkilic, 788 F. App'x 37, 41 (2d Cir. 2019) (holding that "it was plausible to allege that […] general manager, was entrusted with information regarding CIG's customers, suppliers, and proprietary information for the limited purpose of distributing CIG products through CKS, and that his personal use of the information for his own benefit was a breach of duty"); Fine Foods Int'l (New York) v. N. Am. Fine Foods, Inc., No. 99-CV-1062 (ILG), 1999 WL 1288681, at *12 (E.D.N.Y. Nov. 12, 1999) (denying motion to dismiss breach of fiduciary duty claims against former manager); see also Front, Inc. v Khalil, 103 A.D.3d 481 (1st Dept. 2013) (holding rank-and-file employee breached fiduciary duty by diverting work); see also N. K. Intl., Inc. v. Dae Hyun Kim, 68 A.D.3d 608 (1st Dept. 2009) (employee breached fiduciary duty by secretly diverting purchase orders to himself). "Every employee is an agent for the discharge of the duties within the sphere of his employment." See RSSM CPA LLP v. Bell, 2017 N.Y. Misc. LEXIS 40 (N.Y. Sup. Ct. Jan. 6, 2017) (citing Brown Associates Inc v. Fileppo, 38 A.D.2d 518, 519 (1st Dept 1971) (quoting People v. Dempsey, 180 A.D. 765, 772 (2d Dept 1917)). A breach of fiduciary duty has been defined as taking "an action for [one's] own improper personal benefit" that is not in the best interests of the party to whom a duty is owed. See McKinnon Doxsee Agency, Inc. v. Gallina, 187 A.D.3d 733, 736 (2d Dept. 2020) (citing JFK Family Ltd. Partnership v Millbrae Natural Gas Dev. Fund 2005, L.P., 89 A.D.3d 684, 685 (2d Dept. 2011).

Here, Matthew, Cappello and Jacob were employees of Bullion Shark, and thus owed its employer a fiduciary duty. Immediately following the end of Matthew's and Cappello's employment with Bullion Shark, they immediately utilized Bullion Shark's CPI to divert purchases

away from Plaintiff, in violation of their fiduciary duty and restrictive covenants owed to Plaintiff. Thus, Plaintiff is likely to show that Defendants had engaged in misconduct.

Lastly, based upon the diversion of sales of Mr. Boltz, Mr. Foote and Mr. Joslyn, Bullion Shark has been damaged as it has lost those sales from these customers. Even more troubling, these are only the customers that informed Mr. Adamo that Defendants had contacted them. Thus, Plaintiff may have only scratched the surface with respect to uncovering the damage caused by Defendant's misconduct.

Based on the above, Plaintiff is likely to succeed on its claim for breach of fiduciary duty.

**11. Breach of Duty of Loyalty and Violation of the Faithless Servant Doctrine**

In order to establish a claim of breach of the duty of loyalty in New York--sometimes referred to as the "faithless servant doctrine"--the employer plaintiff must show (1) that the employee's disloyal activity was related to "the performance of his duties," and (2) that the disloyalty "permeated the employee's service in its most material and substantial part." See Phansalkar v. Andersen Weinroth & Co., L.P., 344 F.3d 184, 200, 203 (2d Cir. 2003). "[A]n employee owes a duty of good faith and loyalty to an employer in the performance of the employee's duties." See Wallack Frgt. Lines v. Next Day Express, 273 A.D.2d 462, 463 (2d Dept 2000). In this connection, "[a]n employee owes his or her employer 'undivided and unqualified loyalty and may not act in any manner contrary to the interests of the employer'" See Qosina Corp. v. C & N Packaging, Inc., 96 A.D.3d 1032 (2d Dept 2012) (citations omitted).

The duty of loyalty is implied in the employer-employee relationship and rests on the rule that a person who acts as an agent shall not in the same matter act for him or herself. See Alexander & Alexander of New York, Inc. v. Fritzen, 147 A.D.2d 241, 247-48 (1st Dept 1989).

The duty of loyalty exists "where the employee, acting as the agent of the employer, unfairly competes with his employer, diverts business opportunities to himself or others *to the financial detriment of the employer*, or accepts improper kickbacks. See Sullivan & Cromwell LLP v. Charney, 15 Misc. 3d 1128[A] (Sup Ct, New York Cty. April 30, 2007) (Fried, J.) (emphasis added) (citing Western Elec Co. v. Brenner, 41 N.Y.2d 291 (1977) (kickbacks); Lamdin v. Broadway Surface Adv, Corp., 272 N.Y. 133, 138 (1936) (earning secret profits at expense of employer); Alexander & Alexander of New York, Inc., 147 A.D2.d at 247-48 (diverting corporate opportunities); Foley v. D'Agostino, 21 A.D.2d 60 (1st Dept 1964) (competing with employer).

Here, Matthew's, Cappello's and Jacob's duties included using the CPI that was provided to them to facilitate sales and further included their adherence to the restrictive covenants contained in their restrictive covenant agreements. Matthew, Cappello and Jacob owed Bullion Shark their undivided and unqualified loyalty, including abiding by their restrictive covenant agreements, which prohibited Defendants from taking Plaintiff's CPI following the end of their employment. However, Defendants thought they could steal from Plaintiff in order to divert opportunities away from Plaintiff to their own corporation in Florida.

As such, Plaintiff will likely prevail on its claims for breach of duty of loyalty and violation of the faithless servant doctrine.

Accordingly, Plaintiff easily establishes its likelihood of success on the merits on each and every cause of action that it asserts against the Defendants.

### C. The Balance of Hardships Tips Considerably In Bullion Shark's Favor.

Bullion Shark's legitimate interest in protecting against Defendants' exploitation of its CPI and its long-standing relationships and goodwill with its customers certainly outweighs Defendants' minimal interest in misappropriating the CPI so that it can put Plaintiff out of its

business, or do business at all, given that Defendants have engaged in such heinous conduct.

As discussed *supra*, Bullion Shark has created and cultivated the relationships and goodwill with its customer base through its own efforts and with considerable expense, let alone the significant expenditures it undertook to create a master list with qualified leads and existing customers.

Thus, it would be patently unfair to allow Defendants to violate the law in order to exploit and misappropriate Bullion Shark's relationships and goodwill with its customer base by using its CPI to solicit its customers and employees.

On the other hand, granting the relief sought and precluding Defendants from using Bullion Shark's CPI would merely foreclose Defendants from continuing to unlawfully and unfairly compete against Bullion Shark.

Thus, while Bullion Shark stands to lose significant valuable relationships and goodwill – not to mention its entire business – that was obtained through its own painstaking efforts, Defendants merely stand to lose the ability to use Bullion Shark's CPI to continue running the business Defendants have essentially stolen from Plaintiff since Flip a Coin's inception.

As such, any harm suffered by Defendants should the injunction be granted will be minimal at best; instead, the injunction will merely require Defendants to source customers by other means rather than continue violating the law with impunity. Thus, any harm suffered by Defendants is "self-inflicted" by virtue of their decision to engage in theft of trade secrets.

### D. Granting an Injunction Would Not Harm The Public Interest.

Before ordering injunctive relief, the Court should also "ensure that the injunction does not cause harm to the public interest." See SEC v. Citigroup Global Markets, Inc., 673 F.3d 158, 163 n.1 (2d Cir. 2012)).  There is no reason to believe that the relief sought would cause injury to the

public. The protection of Plaintiff's CPI does not, and will not, stifle market competition, cause any dislocation in the market, or impinge on the availability of rare coins and precious metals.

Indeed, the general public remains free to purchase products from Bullion Shark and many other competitors offering to sell rare coins and vintage metals.

The public interest is best served in this instance by the enforcement of the law and the cessation of Defendants from misappropriating Plaintiff's CPI in an effort to cause Bullion Shark harm; after all, if they are capable of stealing from Bullion Shark, what would stop them from inflicting damage upon anyone else, including their own customers.  See Benihana, Inc. v. Benihana of Tokyo, LLC, 784 F.3d 887, 897 (2d Cir. 2015).

Thus, like the remaining factors, this factor favors injunctive relief in favor of Bullion Shark.

## <u>CONCLUSION</u>

Bullion Shark has demonstrated a likelihood of success on the merits of its claims against Defendants and that without an award of injunctive relief under Rule 65 and the DTSA, it would suffer immediate and irreparable harm.

Bullion Shark has no adequate remedy at law and is therefore entitled to a preliminary injunction prohibiting Defendants from using Bullion Shark's CPI, contacting Bullion Shark's customers, hiring  Bullion Shark's employees, harming Bullion Shark's current employees and shutting down Bullion Shark during the pendency of this action.

For these reasons and the reasons set forth herein, Bullion Shark respectfully requests that this Court grant its Order to Show Cause for Preliminary Injunction and Temporary Restraining Order and issue further relief as is just, equitable, and proper.

Dated: Lake Success, New York
      November 16, 2023             Respectfully submitted,

**MILMAN LABUDA LAW GROUP PLLC**

       /s

Emanuel Kataev, Esq.
Kyle F. Monaghan, Esq.
3000 Marcus Avenue, Suite 3W8
Lake Success, NY 11042-1073
(516) 328-8899 (office)
(516) 328-0082 (facsimile)
emanuel@mllaborlaw.com
kyle@mllaborlaw.com

*Attorneys for Plaintiff*
*Bullion Shark, LLC*