UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
BULLION SHARK, LLC,

                              Plaintiff,

      -against-

FLIP A COIN BULLION LLC, MATTHEW FORMAN, CHRISTINA CAPPELLO, JACOB FORMAN and JOSEPH FORMAN,

                              Defendants.
----------------------------------------------------------------X

Case No.: 2:23-cv-6529 (NJC) (ARL)

**DECLARATION OF NICHOLAS ADAMO IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND PERMANENT INJUNCTION**

Nicholas Adamo declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct:

1.     I am an owner and Chief Executive Officer ("CEO") of Bullion Shark, LLC ("Bullion Shark" or "Plaintiff"), the Plaintiff in this case.

2.     As such, I am familiar with all the facts and circumstances heretofore had herein based upon my personal knowledge and a review of documents I maintain at the Bullion Shark office in addition to information I have learned from customers, vendors, and other third parties concerning the Defendants and their conduct described at length herein.

3.     The above-entitled case is brought for the purpose of obtaining a temporary restraining order, a preliminary injunction, and a permanent injunction enjoining the Defendants from continuing to unlawfully utilize Bullion Shark's trade secrets and confidential and proprietary information in violation of their contractual and statutory obligations to Bullion Shark.

4.     More specifically, this lawsuit is brought to enjoin Defendants from committing and continuing to engage in heinous conduct designed to put Bullion Shark out of its business.

5. As set forth herein, Defendants have taken and are taking active steps to steal Bullion Shark's business by poaching its customers in violation of the parties' agreement that specifically prohibits Defendants from, *inter alia*, soliciting Bullion Shark's customers, and **stealing and utilizing Bullion Shark's confidential information and trade secrets to contact and poach these customers**!

6. Bullion Shark was duly incorporated in May 2014.

7. Since its incorporation, Bullion Shark has operated in the highly competitive field of collectible trading, including rare coins and precious metals, and provides its customers with the ability to purchase rare coins and precious metals, in addition to other collectibles.

8. Since its inception, Bullion Shark has invested in, developed, created, and fostered its customer list through its sales, marketing, and advertising efforts, which has cost Plaintiff substantial time, effort, and money to do over the last near-decade.

9. I originally formed Bullion Shark while I was in between undergraduate studies at Hofstra University and matriculating to St. John's University School of Law in Jamaica, NY in 2014 to earn my Juris Doctor.

10. I had originally formed Bullion Shark in order to turn my hobby of collecting rare coins and precious metals into a profitable business.

11. In fact, I set my class schedule at law school in a way that permitted me to focus on Bullion Shark during the day while attending classes at night.

12. In or about May of 2015, my brother, Andrew Adamo ("Andrew"), began working for and with me to help operate Bullion Shark.

13. Andrew is now the President of Bullion Shark.

14. For nearly a decade, my team of employees and I have built and cultivated significant relationships in the rare coins and precious metals industry.

15. In the initial stages of what was our start-up, I would find and cultivate qualified leads and other potential customers that had displayed an interest in gold and silver coins.

16. I would also make contact and connections with potential customers through various trade shows and acquired customers through the eBay business that Bullion Shark initially operated.

17. In the early stages of Bullion Shark, Andrew and I would purchase coins from suppliers on credit, meaning that we would have to pay back the supplier after we marked up the coins and made a sale to a customer.

18. After the supplier was paid back, the profit margin that was realized from our sales would be put back into the business.

19. Andrew and I took minimal compensation from our revenue while the business was still in its start-up phase.

20. We operated the business in this manner for approximately two (2) years; as such, Andrew and I literally put blood, sweat, and tears into building our business to what it is today.

21. Eventually, based on my efforts in sourcing leads for customers and through Bullion Shark's paid advertisements, Bullion Shark had a master list of qualified leads and existing customers that Andrew and I would provide to sales representatives that we hired for their use to facilitate sales.

22. Bullion Shark was able to create and facilitate its list of qualified leads and existing customers through, among other things, the millions of dollars that we spent on advertisement and our attendance and participation at trade shows.

23. Further, in the last year alone, Bullion Shark has spent approximately one million dollars ($1,000,000) in advertising alone in order to help facilitate and grow our list of qualified leads and existing customers.

24. Bullion Shark also spends money to attend and/or have a table at various trade shows around the country, including in Maryland, Pennsylvania, California and Florida.

25. At these trade shows, Bullion Shark sells to other coin dealers and suppliers, and also networks with suppliers, vendors, and – of course – leads or prospective customers.

26. Specifically, Bullion Shark has bought tables at the FUN Show, the Whitman Expo, the ANA Show, which are held in states outside the State of New York.

27. Moreover, Bullion Shark advertises in industry magazines, including but not limited to Coin World, a nationwide magazine, wherein it advertises its business to further facilitate its list of qualified leads which it converts to customers, whose identities are maintained in our customer list.

28. Bullion Shark also created its own website in order to advertise the various rare coins and precious metals that it has to offer, and spent (and continues to spend) substantial sums of money in creating and maintaining that website.

29. When a prospective customer visits the Bullion Shark website, that individual is given the opportunity to provide Bullion Shark with his or her contact information (i.e. name, address, phone number, email address), which Bullion Shark records and saves.

30. When a customer purchases a product from Bullion Shark, we would note down the type of product purchased and the quantity of product, in order to establish a list of qualified leads, potential customers and actual customers that could later be contacted to facilitate additional purchases from Bullion Shark.

31. This information is maintained by Bullion Shark and kept confidential due to its inherent value in assisting it to make additional sales to customers.

32. The success of maintaining this information is evident because, when Bullion Shark contacts a qualified lead or existing customer, a vast majority of the time, that qualified lead or existing customer had already purchased products from Bullion Shark.

33. As such, this confidential information derives independent economic value.

34. Moreover, Bullion Shark's paid advertisement campaign drives people to visit its website, wherein customer information is saved and maintained in an encrypted system.

35. Bullion Shark also pays for a phone system called Phone Burner, wherein its customer information is also saved in to an encrypted system.

36. Recognizing the inherent value in this information, and that it is shared with sales representatives that are hired by it, Bullion Shark requires its employees to sign restrictive covenant agreements prior to being provided information.

37. These agreements provide, generally speaking, that all company information – including customer and lead information – is confidential and proprietary to Bullion Shark, and the agreements require that the sales representatives do not compete with Bullion Shark nor solicit its leads, customers, employees, and/or vendors.

38. In addition, Bullion Shark limits the employees that can view this encrypted customer information; when a sales representative is provided access to this encrypted customer information, they are not provided the entire qualified lead and customer list. Instead, the sales representatives are only provided a selection of qualified leads and existing customers so that the sales representatives are not working on the same customers.

39. This is another method by which Bullion Shark safeguards its confidential information and proprietary trade secrets.

40. Further, Bullion Shark's customer information encrypted in a customer relationship management ("CRM") system and is password protected.

41. Bullion Shark goes through such great lengths to protect this information, its passwords are changed *daily* at the end of every day by Andrew and I. Moreover, there is a multifactor authentication that is required for any salesperson to access the qualified leads and customer information, including myself and Andrew.

42. Only administrative Bullion Shark employees have access to the entire qualified lead and potential customer list in order to fulfill their job duties.

43. For example, Bullion Shark's Shipping Managers have full access to the qualified leads and existing customer information in order to ensure that customer orders are fulfilled and in order to mark up invoices in order to pay invoices to suppliers.

44. However, the Shipping Managers do not have unfettered access to the qualified leads and potential customer lists. Instead, Shipping Managers are only able to access the qualified leads and existing customer lists when they are logged in to Bullion Shark's server.

45. These employees are similarly required to sign restrictive covenant agreements.

46. Bullion Shark's CRM system helps to manage customer data and to issue invoices to its customers for those products that customers purchase from Bullion Shark. Specifically, Bullion Shark uses a relatively unknown CRM system, Sales Binder, to issue invoices to customers.

47. The CRM system is also a proprietary tool of Bullion Shark as further set forth below.

48. It is worthy to note that Bullion Shark has spent thousands of dollars to install, maintain, tailor, and customize the Sales Binder CRM system to Bullion Shark's needs, including implementing a sales tax feature (to deal with the varying tax rates for customers in virtually all fifty states that we sell to) and automatically recording commissions information for payroll purposes with respect to our sales team.

49. Bullion Shark also provides its sales representatives with a comprehensive training program in order to help teach the ins and outs of dealing with rare coins and to mentor sales representatives on how to generate sales.

50. Bullion Shark's training program includes a virtual training program that I personally created, including videos and written instructions on how to sell, how to close, how to talk to customers and how to become knowledgeable in coins (hereinafter the "Bullion Shark Training Program").

51. The Bullion Shark Training Program also includes daily and weekly trainings, which includes product training, learning about information relating to the history of coins and mintages of coins, skill milling (i.e. mock-sales interactions) to learn how to overcome objections from customers, and learning how to discern whether a customer is a qualified prospect.

52. All of this information is confidential and proprietary to Bullion Shark.

53. On or about January 11, 2022, Bullion Shark hired Defendant Matthew Forman (hereinafter "Matthew") as a sales representative. Upon information and belief, when it hired Matthew, he had been unemployed for approximately a year and half. Further, Matthew had represented to Bullion Shark that he was a college graduate, which Bullion Shark later learned was false.

54. When Bullion Shark first employed Matthew, he did not have *any* experience in selling rare coins nor precious metals prior to joining Bullion Shark.

55. On January 11, 2022, Matthew signed a restrictive covenant agreement with Bullion Shark. See copy executed agreement annexed hereto as **Exhibit "A."**

56. The agreement provides, in relevant part, that: (i) Bullion Shark's list of suppliers and customers, customer sales histories, Bullion Shark's pricing, cost data, analytical business data and business strategies and operations is deemed confidential, constitutes trade secrets of Bullion Shark and Matthew agreed and acknowledged to not use, divulge, furnish or make accessible to another other than Bullion Shark; (ii) for a period of two (2) years after his employment with Bullion Shark ended, Matthew would not solicit any customer of Bullion Shark (defined as any entity or person that has availed it/him/herself of Bullion Shark's goods or services within the twelve (12) months prior to Matthew's separation of employment from Bullion Shark) to do business with any other entity in the same or similar type of business; (iii) for a period of two (2) years after his employment with Bullion Shark ended, Matthew would not request or advise any of the past, present and/or expected customers and/or suppliers of Bullion Shark to withdraw, curtail or cancel its business relationship with Bullion Shark; and (iv) for a period of two (2) years after his employment with Bullion Shark ended, Matthew would not induce, or attempt to induce, any employee, agent, independent contractor or sales representative of Bullion Shark to terminate his, her or its employment and/or working business relationship with Bullion Shark.

57. After he signed the agreement, Matthew was provided the Bullion Shark Training Program in order to build up Matthew's knowledge of rare coins and vintage metal, which Matthew did not have prior to joining Bullion Shark.

58. After he signed the agreement, Bullion Shark trained Matthew and provided him with a select group of qualified leads and existing customers for Matthew to contact to facilitate sales.

59. The customers that Bullion Shark provides to its Sales Representatives, including Matthew and Jacob, are customers that previously purchased from Bullion Shark.

60. These customers make up a vast majority of the sales that the Sales Representatives make. The remaining sales are typically made from the qualified leads that Bullion Shark also provides to its Sales Representatives.

61. As a Sales Representative, Matthew did not have complete and unfettered access to Bullion Shark's master list of qualified leads and existing customers.

62. In or about February 2022, Bullion Shark hired Defendant Christina Cappello (hereinafter "Cappello") as an Administrative Assistant. As an Administrative Assistant, Cappello was responsible for processing credit cards, applying payments to invoices and providing customer service to Bullion Shark's customers.

63. As such, Cappello was privy to Bullion Shark's customer list.

64. On February 28, 2022, Cappello signed a restrictive covenant agreement with Bullion Shark.  See copy executed agreement annexed hereto as **Exhibit "B."**

65. The agreement provides, in relevant part, that: (i) Bullion Shark's list of suppliers and customers, customer sales histories, Bullion Shark's pricing, cost data, analytical business data and business strategies and operations is deemed confidential, constitutes trade secrets of Bullion Shark and Cappello agreed and acknowledged to not use, divulge, furnish or make accessible to another other than Bullion Shark; (ii) for a period of two (2) years after her employment with Bullion Shark ended, Cappello would not solicit any customer of Bullion Shark (defined as any

9

entity or person that has availed it/him/herself of Bullion Shark's goods or services within the twelve (12) months prior to Cappello's separation of employment from Bullion Shark) to do business with any other entity in the same or similar type of business; (iii) for a period of two (2) years after her employment with Bullion Shark ended, Cappello would not request or advise any of the past, present and/or expected customers and/or suppliers of Bullion Shark to withdraw, curtail or cancel its business relationship with Bullion Shark; and (iv) for a period of two (2) years after her employment with Bullion Shark ended, Cappello would not induce, or attempt to induce, any employee, agent, independent contractor or sales representative of Bullion Shark to terminate his, her or its employment and/or working business relationship with Bullion Shark.

66. Cappello was eventually promoted to Shipping Manager in or about Fall 2022.

67. Because, as the Shipping Manager, Cappello would have access to all qualified leads and customer lists since she was responsible for fulfilling orders, shipping orders, handling and opening packages from suppliers, maintaining inventory and client and supplier data, Cappello was provided access to such information only after she signed the restrictive covenant agreement.

68. Upon information and belief, Cappello and Matthew were and are involved in a consensual romantic relationship with each other.

69. On or about July 5, 2022, Bullion Shark hired Jacob Forman (hereinafter "Jacob") as a Sales Representative.

70. On July 5, 2022, Jacob signed a restrictive covenant agreement with Bullion Shark. See copy executed agreement annexed hereto as **Exhibit "C."**

71. The agreement provides, in relevant part, that: (i) Bullion Shark's list of suppliers and customers, customer sales histories, Bullion Shark's pricing, cost data, analytical business data and business strategies and operations is deemed confidential, constitutes trade secrets of Bullion

Shark and Jacob agreed and acknowledged to not use, divulge, furnish or make accessible to another other than Bullion Shark; (ii) for a period of two (2) years after his employment with Bullion Shark ended, Jacob would not solicit any customer of Bullion Shark (defined as any entity or person that has availed it/him/herself of Bullion Shark's goods or services within the twelve (12) months prior to Jacob's separation of employment from Bullion Shark) to do business with any other entity in the same or similar type of business; (iii) for a period of two (2) years after his employment with Bullion Shark ended, Jacob would not request or advise any of the past, present and/or expected customers and/or suppliers of Bullion Shark to withdraw, curtail or cancel its business relationship with Bullion Shark; and (iv) for a period of two (2) years after his employment with Bullion Shark ended, Jacob would not induce, or attempt to induce, any employee, agent, independent contractor or sales representative of Bullion Shark to terminate his, her or its employment and/or working business relationship with Bullion Shark.

72. On or about Fall 2022, Jacob left his employment with Bullion Shark in order to go back to school.

73. On or about August 11, 2023, Matthew and Cappello approached me to inform me that they would be resigning from employment with Bullion Shark due to vague and unspecified familial issues. At that time, I did not have any reason to believe that Matthew and Cappello had engaged in any nefarious behavior.

74. However, I later learned that on August 11, 2023, the same day that Matthew and Cappello had informed me that they were resigning due to alleged familial issues, Defendants formed Flip a Coin Bullion, LLC (hereinafter "Flip a Coin") in the State of Florida.

75. I therefore sent a demand letter, by and through counsel, demanding that (i) Defendants cease and desist from using or disclosing Bullion Shark's trade secrets and confidential

11

and proprietary information; (ii) immediately return all trade secrets and confidential or proprietary information belonging to Bullion Shark, including but not limited to customer lists, customer information, financial information, and any other information obtained during Defendants' employment with Bullion Shark; (iii) cease and desist from all activities that violate the law concerning unfair competition and misappropriation of trade secrets; (iv) cease and desist from tortiously interfering with Bullion Shark's business relations with its customers, employees and vendors; (v) cease and desist from making defamatory statements about Bullion Shark and its principals; and (vi) identify and preserve any and all electronically store information of potentially relevant information. See copy of demand letter annexed hereto as **Exhibit "D."**

76. In response to the demand letter, Defendant Joseph Forman ("Joseph") contacted my counsel and threatened us with litigation in an apparent effort to try to intimidate us from enforcing our rights under our agreements with his sons and his son's girlfriend.

77. Upon information and belief, Joseph is the mastermind behind Defendants' plot to steal and plunder Bullion Shark's business in violation of the Defendants' contractual and statutory obligations not to misappropriate confidential information and proprietary trade secrets.

78. On November 9, 2023, I was contacted by numerous Bullion Shark customers to inform me that Matthew, Jacob, and others at "Flip a Coin" were reaching out to them to attempt to sell rare coins and vintage metals.

79. One customer that contacted me on November 9, 2023 was Harry Boltz (hereinafter "Mr. Boltz"). Mr. Boltz was one of my customers whom I regularly interacted with and sold products to. I sourced him as a lead by building and fostering a client relationship with Mr. Boltz after he purchased products from Bullion Shark's website.

80. Matthew only interacted with Mr. Boltz due to Bullion Shark giving Matthew the existing customer information pursuant to the confidentiality provisions in his employment agreement.

81. Upon information and belief, Mr. Boltz is located in Pennsylvania.

82. I recorded my conversation with Mr. Boltz wherein he informed me that the Defendants have been in contact with him to sell him coins, and have done so.

83. A certified transcription of our conversation is annexed hereto as **Exhibit "F;"** see also [2023-11-09 Video Recording Between Nicholas Adamo and Harry Boltz]("Yeah, Flip a Coin. Yeah. I've heard from them." "[I hear from them] maybe three times a week.").

84. A copy of the invoice from Defendants' sale of coins to Mr. Boltz is annexed hereto as **Exhibit "G."**

85. If not for Bullion Shark providing Matthew with Mr. Boltz's information to make sales pursuant to the confidentiality provisions in his restrictive covenant agreement, Defendants would not have known to contact Mr. Boltz without misappropriating Bullion Shark's confidential information and proprietary trade secrets.

86. Another customer that contacted me on November 9, 2023 was Guy Foote (hereinafter "Mr. Foote"). Mr. Foote was a customer of Aaron Harouche (hereinafter "Harouche"), another one of Bullion Shark's Sales Representatives). None of the Defendants interacted with Mr. Foote while they were employed by Bullion Shark.

87. Upon information and belief, Mr. Foote is located in Utah.

88. I recorded my conversation with Mr. Foote wherein he informed me that the Defendants have been in contact with him to sell him coins, and have done so.

89. A certified transcription of our conversation is annexed hereto as **Exhibit "H;"** see also 2023-11-09 Audio Recording Between Nicholas Adamo and Guy Foote (Nicholas Adamo: "Aaron was telling me that you got a call from Flip a Coin Bullion, Matt over there." Guy Foote: "Yeah, Jake." Nicholas Adamo: "Oh Jake, you got a call from Jake Foreman [*sic*], right?" Guy Foote: "Yeah." "He was trying to sell me what I just bought from you guys. The Reverse Proof Morgan & Peace Dollar." "He just called me again yesterday." I don't know how he got my number, or how even know me or what." "I've always dealt with Aaron.")

90. Defendants would not have known to contact Mr. Foote without misappropriating Bullion Shark's confidential information and proprietary trade secrets.

91. Notably, neither Matthew nor Jacob were ever provided with Mr. Foote's information as a lead during their employment, which Mr. Foote confirmed in his conversation with me.

92. As a result, I can regrettably infer that Cappello misappropriated this information and provided it to the remaining Defendants in order to steal Bullion Shark's business.

93. I was also contacted on November 9, 2023 by Mark Joslyn (hereinafter "Mr. Joslyn"). Mr. Joslyn was also a customer of Harouche. None of the Defendants interacted with Mr. Joslyn while they were employed by Bullion Shark.

94. Upon information and belief, Mr. Joslyn is located in Florida.

95. A certified transcription of our conversation is annexed hereto as **Exhibit "I;"** see also 2023-11-09 Audio Recording Between Nicholas Adamo and Mark Joslyn (Nicholas Adamo: "So who did you buy the coins from this morning? I was just sorry. I was confused." Mark Joslyn: "It's called Flip a Coin out of Tamp, Florida." "They [Flip a Coin Bullion] called me this morning

14

and I bought some 2023 slabbed, just the Mint coins MS70s from NGC and I bought like six of them at $65 apiece."

96. A copy of the invoice from Defendants' sale of coins to Mr. Joslyn is annexed hereto as **Exhibit "J."**

97. Defendants would not have known to contact Mr. Joslyn without misappropriating Bullion Shark's confidential information and proprietary trade secrets.

98. Notably, neither Matthew nor Jacob were ever provided with Mr. Joslyn's information as a lead during their employment.

99. As a result, I can regrettably infer that Cappello misappropriated this information and provided it to the remaining Defendants in order to steal Bullion Shark's business.

100. Due to their complete lack of interaction with Mr. Foote and Mr. Joslyn, the only way that Defendants would have known to contact any of these Bullion Shark customers would be by improperly stealing, misappropriating, and disseminating Bullion Shark's encrypted, password-protected, and guarded qualified leads and existing customers list.

101. Moreover, Matthew was prohibited from utilizing Mr. Boltz's contact information pursuant to his employment agreement. As such, the only way that Matthew would have known to contact Mr. Boltz would be by stealing, misappropriating, and disseminating Bullion Shark's encrypted, password-protected, and guarded confidential and proprietary information.

102. Besides Mr. Boltz, Mr. Foote and Mr. Joslyn, I am also aware of other existing customers of Bullion Shark that Defendants have contacted since their employment with Bullion Shark ended, all of which are contained within Bullion Shark's qualified leads and existing customers list.

103. To further demonstrate the lengths to which Defendants went to steal from Bullion Shark, following her separation from employment with Bullion Shark, Cappello had attempted to access Bullion Shark's system. See copy of screenshots showing that Cappello accessed the Bullion Shark Marketing account on August 14, three days after her separation of employment annexed hereto as **Exhibit "K."**

104. Cappello was not authorized to access Bullion Shark's system after she separated from employment with it.

105. There would have been no reason for Cappello to access Bullion Shark's system following the end of her employment with Bullion Shark.

106. I respectfully request that this abominable conduct by Defendants be appropriately addressed by this Court.

107. Immediate injunctive relief is necessary to prevent Defendants from destroying the customer relationships and goodwill that I have spent nearly a decade building, from stealing our customers, which Defendants obtained solely by using our trade secrets and confidential information, and causing further imminent and irreparable financial harm to Bullion Shark, as Defendants have unquestionably set out to do.

108. In addition to securing the return of our misappropriated information back to us from Defendants and enjoining Defendants from engaging in any further illegal activity, it is essential that Bullion Shark be permitted to forensically examine the Defendants' email accounts, computers, cellular phones, and any other electronic devices or cloud storage accounts, to determine the exact nature and extent of Defendants' unlawful schemes to steal Bullion Shark's customers and employees.

109. Based on Flip a Coin's egregious conduct, it should also be shut down pending the outcome of this litigation.

110. I respectfully request that this Court grant the relief requested herein.

I declare under penalty of perjury that the foregoing is true and correct. Executed on November 16, 2023.

*Nicholas Adamo*

Nicholas Adamo

17