**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Bullion Shark LLC,<br><br>                           Plaintiff,<br><br>              -v-<br><br>Flip A Coin LLC, et al.,<br><br>                           Defendants. | 2:23-cv-6529<br>(NJC) (ARL) |

**MEMORANDUM AND ORDER**

NUSRAT J. CHOUDHURY, District Judge:

Plaintiff Bullion Shark LLC ("Plaintiff" or "Bullion Shark") filed a Complaint for damages and injunctive relief against Defendants Flip A Coin Bullion, LLC ("Flip A Coin" or the "Corporate Defendant"), Matthew Forman, Christina Cappello, Jacob Forman, and Joseph Forman (collectively, "Individual Defendants") to stop them from allegedly stealing confidential information and trade secrets concerning Plaintiff's potential and current customers and the pricing of its products—rare coins and precious metals. Compl., ECF No. 1. The Complaint brings claims for violation of: (1) the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 ("DTSA"); (2) the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"); and New York common law protections against (3) trade secret misappropriation, (4) unfair competition, (5) tortious interference with contractual relations, business relations, and prospective economic advantage, (6) unjust enrichment, (7) breach of contract, (8) conversion, (9) violation of the faithless servant doctrine, (10) breach of duty of loyalty, and (11) breach of fiduciary duty. Compl. ¶ 1.

On November 17, 2023, Bullion Shark filed a Motion for Temporary Restraining Order (TRO) and Preliminary Injunction requesting eleven forms of temporary and/or preliminary injunctive relief. ECF Nos. 15–18. The Court has reviewed Plaintiff's Motion, Memorandum of Law, the Declaration of Kyle F. Monaghan, the Declaration of Nicholas Adamo and attached exhibits, an opposition submission filed by the Individual Defendants while they were proceeding *pro se*, as well as correspondence from Plaintiff and the Individual Defendants exchanged prior to Defendants' retention of counsel. ECF Nos. 21–23, 25, 27–32.[1] The Court held hearings on Bullion Shark's TRO motion on November 28, 2023 and November 30, 2023. For the following reasons, and those set forth on the record during the November 30, 2023 hearing, the Court denies Plaintiff's Motion for a Temporary Restraining Order and reserves decision on the Motion for a Preliminary Injunction pending an evidentiary hearing.

## JURISDICTION

The Court has federal question jurisdiction over Bullion Shark's Defend Trade Secrets Act and Computer Fraud and Abuse Act claims pursuant to 18 U.S.C. § 1331. Because the remaining state law claims are part of the same case or controversy and arise out of the same common nucleus of operative facts, the Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

The Court has personal jurisdiction over Corporate Defendant Flip A Coin and Individual Defendants Matthew and Jacob Forman and Christina Cappello because they have minimum contacts with New York. "Where the claim arises out of, or relates to, the defendant's contacts with the forum . . . —i.e., specific jurisdiction is asserted—minimum contacts necessary to

---

[1] Counsel for Defendants entered a Notice of Appearance on November 29, 2023, ECF No. 30, and represented all Defendants at the November 30, 2023 hearing on the TRO Motion.

support such jurisdiction exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013) (internal citation and brackets omitted). Under New York's long-arm statute, "a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state . . . ." N.Y. C.P.L.R. § 302(a)(1). Jurisdiction under Section 302(a)(1) requires showing that "(1) [t]he defendant . . . transacted business within the state" and that "(2) the claim asserted . . . arise[s] from that business activity." *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006) (citing *McGowan v. Smith*, 52 N.Y.2d 268, 273 (1981)). The second prong of the test "does not require a causal link between the defendant's New York business activity and a plaintiff's injury," but "[i]nstead . . . requires 'a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former, regardless of the ultimate merits of the claim.'" *Licci*, 732 F.3d at 168–69 (quoting *Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 339 (2012)).

The Complaint alleges that Bullion Shark is incorporated and maintains its principal place of business in Nassau County, New York. Compl. ¶ 4. It further alleges that Defendants Cappello and Matthew and Jacob Forman previously worked for Bullion Shark and signed agreements in which they promised not to disclose Bullion Shark's confidential information and trade secrets and agreed to restrictive covenants limiting their ability to solicit Bullion Shark's customers and leads upon termination of their employment. *Id.* ¶¶ 22, 24–25, 27–28, 30. The Complaint contends that these defendants accessed Bullion Shark's confidential and proprietary information during their employment, *id.* ¶¶ 23, 26, 29, and improperly obtained and disclosed

3

that information to Flip A Coin, *id.* ¶¶ 39–41. The Declaration of Nicholas Adamo, Bullion Shark's owner and chief executive officer, attests to similar facts. Adamo Decl., ECF No. 18 ¶¶ 55–74, 99–105.

The Complaint and Adamo Declaration offer sparse information, however, about Defendant Joseph Forman's contacts with New York. The Complaint alleges, upon information and belief, that Joseph Forman lives in Florida, knew of the terms of the employment agreements that his sons—Matthew and Jacob Forman—and Christina Cappello entered into with Bullion Shark, and "substantially assisted and was complicit in Matthew's, Cappello's and Jacob's unlawful conduct." Compl. ¶¶ 9, 76. Adamo surmises that "[u]pon information and belief, Joseph is the mastermind behind Defendants' plot to steal and plunder Bullion Shark's business." Adamo Decl. ¶ 77. None of Plaintiff's submissions to date, including the Complaint or the Monaghan and Adamo Declarations and attached exhibits, show that Joseph Forman "purposefully availed [himself] of the privilege of doing business in" New York and therefore "could foresee being haled into court" here. *Licci*, 732 F.3d at 170. Joseph Forman has not, however, raised personal jurisdiction as a defense in his Answer to the Complaint, ECF No. 41,[2] or moved to dismiss the claims against him for lack of personal jurisdiction under Rule 12(b)(2), Fed. R. Civ. P. For this reason, he has waived a personal jurisdiction defense and is subject to

---

[2] The Court extended the date for Defendants to respond to the Complaint three times in light of the Individual Defendants' *pro se* status. *See* Elec. Order Oct. 10, 2023; Elec. Order Nov. 14, 2023; Elec. Order Nov. 28, 2023. Additionally, the Court notified all Defendants several times of the benefits of retaining counsel. *See* Elec. Order Oct. 10, 2023; Elec. Order Nov. 20, 2023; Elec. Order Nov. 21, 2023; Elec. Order Nov. 22, 2023; Elec. Order Nov. 28, 2023. Joseph Forman, like the other Individual Defendants, attempted to file an Answer to the Complaint while he was proceeding *pro se*. *See* ECF. No. 37. Following the appearance of counsel for Defendants on November 29, 2023, all Defendants filed a single Answer. *See* ECF No. 41. Forman does not raise an objection to personal jurisdiction in either of these pleadings. The Court considers the later-filed pleading, which was prepared with the assistance of counsel, to be the operative Answer for all Defendants.

this Court's jurisdiction. *See Fuld v. Palestine Liberation Org.*, 82 F.4th 74, 89 (2d Cir. 2023) ("[T]he failure to enter a timely objection to personal jurisdiction constitutes, under Rule 12(h)(1), a waiver of the objection . . . .") (citation and internal quotation marks omitted).

Venue is proper under 28 U.S.C. § 1381(b) and 18 U.S.C. § 1965 because, as described above, a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

### STANDARD OF REVIEW

The Second Circuit has long established that a party seeking a preliminary injunction must show three things: (1) irreparable harm in the absence of an injunction pending resolution of the action, (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party, and (3) that a preliminary injunction is in the public interest. *See N. Am. Soccer League, LLC v. U.S. Soccer Fed'n*, 883 F.3d 32, 37 (2d Cir. 2018). Courts apply the same standard when considering an application for a TRO. *See e.g.*, *Omnistone Corp. v. Cuomo*, 485 F. Supp. 3d 365, 367 (E.D.N.Y. 2020); *Coronel v. Decker*, 449 F. Supp. 3d 274, 280 (S.D.N.Y. 2020).

### DISCUSSION

While Plaintiff alleges that Defendants have stolen and use Bullion Shark's trade secrets and confidential information, Plaintiff has not introduced sufficient evidence at this early stage to warrant the "extraordinary remedy" of a temporary restraining order. *Benisek v. Lamone,* 138 S. Ct. 1942, 1943 (2018) (per curiam) ("[A] preliminary injunction is an extraordinary remedy never awarded as of right.") (citation and quotation marks omitted).

I.  **Irreparable Harm**

At this early stage of the proceedings, Plaintiff has not shown that it will suffer irreparable harm absent the grant of a TRO. Demonstrating irreparable harm is "the single most important prerequisite for the issuance of" a temporary restraining order. *Faively Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal citation omitted). A business's "loss of reputation and goodwill constitutes irreparable harm." *Really Good Stuff, LLC v. BAP Investors, LLC*, 813 F. App'x 39, 44 (2d Cir. 2020) (citing *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004)). "Goodwill" refers to a business's expectation "of continued patronage" by its customers. *Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 555–56 (1993) (internal citation omitted). But the "loss of trade secrets and client relationships does not establish irreparable harm absent a showing that there is an imminent risk of dissemination of trade secrets and that plaintiff's injuries are not compensable through an award of damages." *See Faiveley*, 559 F.3d at 119 ("[W]here there is no danger that a misappropriator will disseminate proprietary information, 'the only possible injury that [the] plaintiff may suffer is loss of sales to a competing product . . . [which] should be fully compensable by money damages.'" (quoting *Geritrex Corp. v. Dermarite Indus., LLC*, 910 F.Supp. 955, 966 (S.D.N.Y. 1996))). In other words, if Bullion Shark's alleged loss of sales and client relationships to Flip A Coin can be calculated and compensated through damages, Plaintiff has failed to show irreparable harm. That is the case here.

Bullion Shark argues that it is at risk of irreparable harm in the form of lost customers and sales due to Defendants' alleged solicitation of Plaintiff's confidential clients and leads. Pl.'s Mem. Supp. TRO, ECF No. 16, 12–13. More specifically, Nicholas Adamo attests that Defendants Matthew and Jacob Forman worked for Bullion Shark as sales representatives at various times in 2022 and 2023, and during that time had access to portions of the company's

master list of qualified leads and customer information, but not the entire list. Adamo Decl. ¶¶ 53, 58, 61, 69. Adamo further attests that Defendant Cappello worked for Bullion Shark in 2022 and 2023, first as an administrative assistant and later as a shipping manager, and during certain periods of time, had access to Plaintiff's entire customer list. *Id.* ¶¶ 62–63, 66–67. According to Adamo, each of these defendants signed employment agreements that contained provisions prohibiting the disclosure of Bullion Shark's confidential and proprietary information and trade secrets, including the company's list of suppliers and customers, customer sales histories, and pricing and cost data. *Id.* ¶¶ 55–56, 64–65, 70–71. Adamo states that Matthew Forman and Cappello stopped worked for Bullion Shark in August 2023, and that Jacob Forman left at the end of summer 2023. *Id.* ¶¶ 72–73.

Adamo attests that in November 2023, he became aware that Matthew and Jacob Forman were in contact with Bullion Shark customers. *Id.* ¶ 78. He states that on November 9, 2023, he spoke to three Bullion Shark customers—Harry Boltz of Pennsylvania, Guy Foote of Utah, and Mark Josyln of Florida—who said Flip A Coin and Matthew and Jacob Forman recently solicited them to purchase coins. *Id.* ¶¶ 78–96. Adamo further attests that: (1) Boltz purchased coins from Flip A Coin after being solicited by Matthew Forman following his departure from Bullion Shark, *id.* ¶¶ 79–84; *id.*, Adamo Decl., Ex. F – Boltz Invoice, ECF No. 18-6; (2) Jacob Forman tried to sell Foote a specific type of coin that he had recently purchased from Bullion Shark—the "Reverse Proof Morgan & Peace Dollar", Adamo Decl. ¶¶ 86–89; and (3) Joslyn recently purchased coins from Flip A Coin, *id.* ¶¶ 93–96; Adamo Decl., Ex. I – Joslyn Invoice, ECF No. 189. According to Adamo, Matthew and Jacob Forman did not have access to Foote or Joslyn's contact information or information about their past purchases from Bullion Shark during the time they worked for Bullion Shark because they were customers of a different Bullion Shark sales

representative—Aaron Harouche. *Id.* ¶¶ 86, 93. Adamo "infer[s]" that Cappello disclosed Foote and Joslyn's contact and past purchase information to Matthew and Jacob Forman "in order to steal Bullion Shark's business," *id.* ¶¶ 92, 99, in violation of the confidentiality and non-disclosure provisions of her employment agreement with the company, *id.* ¶¶ 86, 91–92, 97–100.

On this record, Plaintiff fails to allege irreparable harm. Plaintiff identifies three customers who were solicited by Defendants, two of whom—Boltz and Joslyn—purchased coins from Defendants. Adamo attaches Flip A Coin invoices showing that Boltz paid $1,937 for thirty-three coins identified as "2023 Silver Panda NGC MS70 – Magnum Opus – 40th Anv," Adamo Decl., Ex. F – Boltz Invoice, and that Joslyn paid $230 for two "2019 Silver Eagle NGC MS 70" coins and $325 for five "2024 Silver Eagle NGC MS70 Early Release" coins, *id.*, Ex. I – Joslyn Invoice at 2–3. The income generated by Flip A Coin from these purchases is quantifiable and compensable in an award of damages. Moreover, the transcripts of Adamo's conversations with Boltz, Foote, and Joslyn do not suggest that Defendants' conduct has caused, or is causing, these individuals to lose their goodwill toward Bullion Shark and Adamo or that they will not purchase from the company in the future.[3] The record thus undercuts Bullion Shark's contention

---

[3] In his conversation with Adamo, Boltz agreed to send the invoice for his Flip A Coin purchase to Adamo so that Bullion Coin could beat its competitor's price:

| | |
|---|---|
| Nicholas Adamo: | . . . Oh MS70. I could have sold you those at like 59 bucks. |
| Harry Boltz: | Oh. |
| Nicholas Adamo: | If you want, can you send me the invoice? Because if you send me the invoice, you know, like I said, I could discount you accordingly. You know and like I said, I'll make sure that you save a boatload of money. I mean, that's a lot of money to save. |
| Harry Boltz: | I can do it. I'll get it sent to you tonight. |

Adamo Decl, Ex. E – Boltz Tr., ECF No. 18-5 at 2. Similarly, Joslyn agreed to send Adamo his Flip A Coin invoice to get better prices from from Bullion Shark in the future:

8

that in the absence of a TRO, it will face irreparable harm in the form of loss of reputation, goodwill, customers, and sales that cannot be quantifiable and compensated by damages.

Additionally, the record at this early stage of the proceedings raises questions of fact regarding whether Bullion Shark will experience irreparable harm in the absence of a TRO. For example, in an opposition submission filed with the Court while the Individual Defendants were proceeding *pro se*, the Individual Defendants dispute Plaintiff's assertion that Matthew and Jacob Forman and Cappello signed the employment agreements put forth by Bullion Shark. Indiv. Defs.' Opp'n to TRO, ECF No. 20. Whether or not each of these defendants actually signed the agreements that Bullion Shark filed with the Court is a question of fact to be resolved

---

| | | |
|---|---|---|
| Nicholas Adamo: | | So definitely you bought from Flip a Coin Bullion, those six coins. And will you be able to send us you know, the email because I like to beat their pricing if I can. |
| Mark Joslyn: | | Yea, I guess so. |
| Nicholas Adamo: | | Okay, cool. Yeah. Send me the invoice when you can or to Aaron, and he'll forward it to me and then we'll beat their pricing. I promise. |
| Mark Joslyn: | | Okay. |
| Nicholas Adamo: | | . . . All right. Awesome Mark. I appreciate it, my friend. |
| Mark Joslyn: | | Yes sir. |
| Nicholas Adamo: | | All right. Let's see, you have a wonderful day. We'll speak in the morning. |
| Mark Joslyn: | | All right. Thank you, sir. |

Adamo Decl., Ex. H – Joslyn Tr., ECF No. 18-8 at 2. Finally, Foote, who reported being solicited by Flip A Coin but had not purchased anything from Defendants, expressed his appreciation for Adamo during their conversation:

| | |
|---|---|
| Nicholas Adamo: | Hey Guy, it's Nick over at Bullion Shark, the owner, how are you? |
| Guy Foote: | Good, how you doing, Nick? |
| Nicholas Adamo: | Good, my friend. It's a pleasure to speak with you. Aaron told me a lot about you. |
| Guy Foote: | Yeah? |
| Nicholas Adamo: | I appreciate all of your business. |
| Guy Foote: | For sure. I appreciate you. |

Adamo Decl., Ex. G – Foote Tr., ECF No. 18-7 at 2.

9

at a forthcoming preliminary injunction hearing. There are also questions of fact concerning the admissibility of transcripts of phone calls that Adamo attached to his declaration. Adamo Decl., Exs. E, G, H. Adamo recorded these phone calls, but two of the participants to the calls live in states that require two-party consent to such recordings. Adamo Decl. ¶¶ 81–82, 94–95. According to Adamo, Boltz lives in Pennsylvania and Joslyn lives in Florida—both states require two-party consent. *See* Fla. Stat. § 943.03; 18 Pa. Cons. Stat § 5703. It is not clear from the statements in the Adamo Declaration or the transcripts of the calls whether Boltz and Josyln were physically located in their states of residence at the time they spoke to Adamo, and, if so, whether Adamo asked for or secured their consent. In their *pro se* submissions and correspondence, the Individual Defendants contend that Boltz, Foote, and Joslyn did not consent to the recordings. Indiv. Defs.' Opp'n to TRO ¶ 8; Indiv. Defs.' Add. to Nov. 28, 2023 Hr'g, ECF No. 32 at 2. These questions concerning the admissibility of two phone call transcripts and Mr. Adamo's testimony about those specific phone calls preclude relying on these submissions to find irreparable harm at this time.

    **II.**    **Likelihood of Success on the Merits or Both Serious Questions on the Merits and a Balance of Hardships Decidedly Favoring the Moving Party**

Although Bullion Shark's failure to show irreparable harm precludes the grant of a TRO, the Court also finds that as a result of the aforementioned questions of fact, Plaintiff also fails to meet the second prong of the TRO analysis, which requires either showing a likelihood of success on the merits or demonstrating the existence of both serious questions on the merits and a balance of hardships in Plaintiff's favor. *See N. Am. Soccer League, LLC*, 883 F.3d at 37.

The Court considers whether Plaintiff has met the lower bar required under the second prong of the TRO analysis—the requirement to show serious questions on the merits of Plaintiff's claims and that the balance of hardships tips in Bullion Shark's favor. Based on the

record, at this early stage of the proceedings, the Court finds that Plaintiff has not shown serious questions on the merits on any of the eleven claims raised in its Motion for a Temporary Restraining Order. The Court addresses Bullion Shark's Defend Trade Secrets Act and New York common law trade secrets misappropriation claims as well as its claim to enforce the Computer Fraud and Abuse Act. The Court does not, however, consider in detail the remaining claims Bullion Shark invokes in its Motion for a Temporary Restraining Order because Plaintiff's briefing on those claims was not sufficiently detailed to provide a basis for relief.

### A. Defend Trade Secrets Act

To prevail under the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836, Plaintiff must show that Defendants disclosed a trade secret without consent where either: (1) that secret was acquired by improper means; or (2) at the time of disclosure, Defendants knew or had reason to know that the secret was acquired by improper means, under circumstances creating a duty to maintain secrecy, or derived from a person who owed such a duty. 18 U.S.C. § 1839(5). Under this test, "improper means" includes misrepresentation and breach or inducement of the breach of the duty to maintain secrecy; it does not include where the information in question is "reverse engineer[ed]" or "independent[ly d]eriv[ed]". *Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 340 (E.D.N.Y. 2020).

First, Plaintiff must establish that it has a trade secret. Bullion Shark's brief is inconsistent in how it describes the alleged trade secret—sometimes it refers only to a master list of "qualified leads and existing customers," *see, e.g.*, Pl.'s Mem. Supp. TRO at 1–3, 19, 22, and at other times it refers to that list as well as Plaintiff's "list of suppliers, its customer sales histories, Bullion Shark's pricing and cost data, Bullion Shark's analytical business data and business data, strategies and operations," Pl.'s Mem. Supp. TRO at 9–10. The Court's best

11

understanding is that Plaintiff asserts trade secret protection over the master list of existing and potential customers (referred to as "qualified leads") as well as information about products that individuals have purchased from Plaintiff in the past. Plaintiff is likely to show that its master list of qualified leads and customer information is a trade secret under the DTSA.

The statute defines a trade secret to be "all forms and types of financial business, scientific, technical, economic, or engineering information . . . if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value . . . from not being generally known to and not being readily ascertainable through proper means by another person who can obtain eco value from the disclosure or use of the information[.]" 18 U.S.C. 1839(3). This Court has previously found that "[a] customer list developed by a business through substantial effort and kept in confidence may be treated as a trade secret and protected . . . against disclosure to a competitor, provided the information it contains is not otherwise readily ascertainable." *Plaza Motors of Brooklyn, Inc. v. Bogdasarov*, No. 21-cv-6545 (KAM), 2021 WL 5630910 (E.D.N.Y. Dec. 01, 2021) (quoting *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999)). Similarly, the Court has found a business's customer lists and sales reports, which recorded how much customers paid, to be trade secrets. *See IME Watchdog, Inc. v. Gelardi*, No. 22CV1032PKCJRC, 2022 WL 1525486, at *8 (E.D.N.Y. May 13, 2022), *reconsideration denied*, No. 22CV1032PKCJRC, 2022 WL 2316137 (E.D.N.Y. June 28, 2022).

Here, the record shows that Bullion Shark created its master list of existing customers and qualified leads through paid advertising, participating in trade shows, and maintaining a website; Plaintiff took reasonable measures to keep the list a secret; and that the list has

independent economic value by giving Plaintiff an advantage of its competitors. Adamo Decl. ¶¶ 8, 21–27, 33. Accordingly, the Court finds that Plaintiff's master list is likely a trade secret.

Second, Plaintiff must show either that the master list was acquired by improper means or that Defendants knew or had reason to know that the secret was acquired by improper means, under circumstances creating a duty to maintain secrecy, or derived from a person who owed such a duty. *See* 18 U.S.C. § 1839(5). Bullion Shark's evidence does not suggest that all Defendants acquired the master list through improper means. Rather, Plaintiff appears to argue that because Defendants Matthew and Jacob Forman and Christina Cappello signed the employment agreements in question, Pl.'s Mem. Supp. TRO at 17, they, Flip A Coin, and Joseph Forman knew, or had reason to know, that information from Bullion Shark's master list of qualified leads and existing customers consisted of confidential trade secrets and was acquired by Cappello and Matthew and Jacob Forman under circumstances creating a duty to maintain secrecy. Plaintiff alleges that these employment agreements required those three Defendants to adhere to certain confidentiality and non-disclosure provisions that would prevent their use of the master list in the way Plaintiff alleges. *Id.* at 4–6. Plaintiff's argument rests on the theory that Defendants were contractually precluded from divulging any confidential information. But in their *pro se* opposition submission, Defendants Matthew and Jacob Forman and Cappello argue that they did not sign the agreements in question and are unfamiliar with them, and that Bullion Shark did not explain what a non-compete agreement was to them. Indiv. Defs.' Opp'n to TRO ¶ 1–2. Additionally, Plaintiffs have not addressed whether the restrictive covenants contained in the employment agreements are reasonable under New York law, which likely governs the covenants. *See S. Nassau Control Corp. v. Innovative Control Mgmt. Corp. et al.*, No. 95-CV-3724 (DRH), 1996 WL 496610, at *5 (E.D.N.Y. June 20, 1996) (noting that under New York

13

law, "[r]estrictive covenants relating to employment are disfavored" but "will be enforced if reasonably limited in time and scope, to the extent necessary to protect the employer" (internal citations and quotation marks omitted).

It is clear to the Court that there is a dispute of fact as to whether Defendants Cappello and Matthew and Jacob Forman signed the contracts, which the Court cannot resolve on a TRO. Because Bullion Shark advances no other argument for why Defendants knew or had reason to know that the master list, or information from the master list, was acquired by improper means, under circumstances creating a duty to maintain secrecy, or derived from a person who owed such a duty, the Court finds that Plaintiff fails to demonstrate that there is a serious question as to the merits of its DTSA claim.

B.  Misappropriation of Trade Secrets

"Under New York law, '[a] plaintiff claiming misappropriation of a trade secret must prove that (1) it possessed a trade secret, and (2) the trade secret was used by defendant in breach of an agreement, confidence, or duty, or as a result of discovery by improper means.'" *Intertek Testing Servs.*, 443 F. Supp. 3d at 339 (citing *Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 49 (2d Cir. 2019)). "A trade secret is any formula, pattern, device or compilation of information which is used in one's business, and which gives one an opportunity to obtain an advantage over competitors who do not know or use it." *Id.*; *accord Faiveley Transp. Malmo AB*, 559 F.3d at 117. Courts applying New York law find a protectable interest in confidential information that does not rise to the level of a trade secret. *See, e.g., Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525 (S.D.N.Y. 2004).

For the same reasons that Bullion Shark is likely to show that its master list of existing customers and qualified leads, as well as past purchase information, constitutes a trade secret

14

under DTSA, the Court finds that Plaintiff is likely to show that this information constitutes a trade secret under New York common law. *See* discussion *supra* at 12.

To prove a trade secret misappropriation claim under New York law, Plaintiff must then show that Defendants used the trade secret in breach of an agreement, confidence or duty, or as a result of discovery by improper means. *See Intertek Testing Servs., N.A., Inc.*, 443 F. Supp. 3d at 340. The Court has described factual disputes concerning whether Matthew and Jacob Forman and Christina Cappello signed employment agreements with Bullion Shark that contain non-disclosure provisions and restrictive covenants. *See* discussion *supra* at 9–10. For the reasons already discussed, the Court finds Plaintiff has failed to raise serious questions at this early stage about whether Defendants knew or had reason to know that Bullion Shark's trade secrets and confidential information were acquired by improper means, under circumstances creating a duty to maintain secrecy, or derived from a person who owed such a duty.

C. Computer Fraud & Abuse Act

Plaintiff's Complaint alleges violations of Section 1030(a)(4) and Section 1030(a)(5) of the Computer Fraud & Abuse Act, 18 U.S.C. § 1030, against Defendants Matthew and Jacob Forman and Cappello. Section 1030(a)(4) applies to someone who "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period[.]" Section 1030(a)(5) applies to someone who "(A) knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer; or (B) intentionally accesses a protected computer without authorization,

15

and as a result of such conduct, recklessly causes damage; or (C) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss."

Bullion Shark has failed to show serious questions on the merits of these claims. In the first place, Plaintiff's brief only addresses the alleged violation of Section 1030(a)(4) and says nothing about the Section 1030(a)(5) allegations. Pl.'s Mem. Supp. TRO at 18–20. As a result, it appears that Plaintiff is only moving for a TRO on its claim under Section 1030(a)(4). Additionally, the case Plaintiff cites in support of its claim, *United States v. Gasperini*, 894 F.3d 482 (2d Cir. 2018), addresses a violation of Section 1030(a)(2)(C), not Section 1030(a)(4) or (a)(5), which are the sections of the statute Plaintiff alleges Defendants violated.

Even if this Court were to focus on Section 1030(a)(4), Plaintiff's submissions fail to make the required showing. Under that section, Plaintiff must show that Defendants (1) knowingly and with intent to defraud (2) accessed protected computer (3) without consent and (4) obtained something worth more than $5,000. 18 U.S.C. § 1030(a)(4).

Based on the evidence in the record at this stage of the proceedings, Bullion Shark is likely to show that its customer relations system ("CRM") is a "protected computer" under the statute and that the value of the information on the master list exceeded $5,000 because Bullion Shark "spent approximately one million dollars ($1,000,000) in advertising alone in order to help facilitate and grow our list of qualified leads and existing customers." Adamo Decl. ¶ 23. But the record does not establish that Defendants knowingly accessed that master list without authorization in order to misappropriate trade secrets.

Bullion Shark alleges that Defendant Cappello accessed Plaintiff's email accounts and provided information procured through that access to the other Defendants, particularly Matthew

16

and Jacob Forman. Pl.'s Mem. Supp. TRO at 15. Plaintiff attaches screenshots to the Adamo Declaration that purport to show Defendant Cappello's attempt to access Bullion Shark's email account after her employment at the company had ended. Adamo Declaration, Ex. J – Cappello System Access, ECF No. 18-10. But there are questions of fact that preclude Plaintiff from making the required showing under this prong. For example, it is not clear from the Adamo Declaration nor the attached exhibit what those screenshots are, who made them, on what device, who the participants in the message exchange are, and what some of the terms and other phrases used in the message exchange mean. Additionally, while Plaintiff argues that neither Matthew nor Jacob Forman were given Foote and Joslyn's information during their employment with Bullion Shark, and that therefore, Cappello must have improperly disclosed that information to them, Pl.'s Mem. Supp. TRO at 15, the Individual Defendants argue in their *pro se* opposition that Foote and Joslyn's information was publicly available for purchase and attach documents purporting to show they purchased that information from Sales Leads TV Incorporated, Indiv. Defs.' Opp'n to TRO at 3, 5–6. At this time, the Court cannot discern what information Sales Leads TV provided Defendants, including whether that information includes confidential contact and past purchase information about Foote and Joslyn. The Court cannot make an evidentiary finding without a hearing and, as a result, cannot find that Plaintiff has shown serious questions on the merits as to its claim under Section 1030(a)(4) of the CFAA.

      The briefing on Bullion Shark's eight additional legal claims is so thin that the Court does not find that Plaintiff is likely to show success on the merits or that Plaintiff has raised serious questions on the merits at this time. Pl.'s Mem. Supp. TRO at 22–30. With regard to the breach of contract claim, the Court notes that the dispute about whether three of the Individual Defendants signed the employment agreements put forth by Bullion Shark is a material question

of fact precluding the grant of a TRO at this early stage of the proceedings because "the existence of an agreement" is an element of a breach of contract claim under New York law. *Sackin v. TransPerfect Glob., Inc.*, 278 F. Supp. 3d 739, 750 (S.D.N.Y. 2017) ("Under New York law, a breach of contract claim requires (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of the contract by the defendant, and (4) damages." (quoting *Balk v. N.Y. Inst. of Tech.*, 683 Fed. Appx. 89, 95 (2d Cir. 2017)).

D. <u>Balance of Hardships</u>

Because this Court does not find that Plaintiff has shown irreparable harm or serious questions about the merits its claims, it does not need to inquire as to the balance of hardships.

**III.     Public Interest**

Because Plaintiff has failed to meet the first two prongs of the threshold for a TRO, the Court does not need to reach the final prong—whether the public interest weighs in favor of a TRO.

**CONCLUSION**

For the reasons set forth above, the Court denies Plaintiff's Motion for a Temporary Restraining Order and reserves decision on Plaintiff's Motion for a Preliminary Injunction pending an evidentiary hearing.

Dated: Central Islip, New York
December 6, 2023

_____/s Nusrat J. Choudhury_____
NUSRAT J. CHOUDHURY
United States District Judge