```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
 BULLION SHARK, LLC,
                                                                      Case No.: 2:23-cv-6529 (NJC) (ARL)
                              Plaintiff,
                                                                      **DECLARATION OF NICHOLAS
         -against-                                                    ADAMO IN SUPPORT OF
                                                                      PLAINTIFF'S MOTION FOR
 FLIP A COIN BULLION LLC, MATTHEW                                     RECONSIDERATION OF ITS
 FORMAN, CHRISTINA CAPPELLO, JACOB                                    MOTION FOR A TEMPORARY
 FORMAN and JOSEPH FORMAN,                                            RESTRAINING ORDER

                              Defendants.
-----------------------------------------------------------------X
```

Nicholas Adamo declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct:

1. I am an owner and Chief Executive Officer ("CEO") of Bullion Shark, LLC ("Bullion Shark" or "Plaintiff"), the Plaintiff in this case.

2. As such, I am familiar with all the facts and circumstances heretofore had herein based upon my personal knowledge and a review of documents I maintain at the Bullion Shark office in addition to information I have learned from customers, vendors, and other third parties concerning the Defendants and their conduct described at length herein.

3. The above-entitled case is brought for the purpose of obtaining a temporary restraining order, a preliminary injunction, and a permanent injunction enjoining the Defendants from continuing to unlawfully utilize Bullion Shark's trade secrets and confidential and proprietary information in violation of their contractual and statutory obligations to Bullion Shark.

4. More specifically, this lawsuit is brought to enjoin Defendants from committing and continuing to engage in heinous conduct designed to put Bullion Shark out of its business.

5. I respectfully incorporate by reference all facts as established in my prior Declaration in Support of Plaintiff's Motion for a Temporary Restraining Order, Preliminary Injunction and Permanent Injunction and the exhibits attached thereto. See ECF Docket Entries [18](), [18-1](), [18-2](), [18-3](), [18-4](), [18-5](), [18-6](), [18-7](), [18-8](), [18-9](), and [18-10]().

6. On their first day of employment, all employees of Bullion Shark are provided with email access to a Bullion Shark email address.

7. On or about January 11, 2022, Matthew Forman ("Matthew") began employment with Bullion Shark and was provided access to the email account mattf@bullionsharks.com.

8. On Matthew's first day of employment, he was required to sign an employment agreement as part of his onboarding process and in order to remain employed with Bullion Shark. Annexed hereto as **Exhibit "A"** is a copy of email correspondence from mattf@bullionsharks.com as of January 12, 2022.

9. I uploaded Matthew's employment agreement to SignNow, then reached out to Matthew and asked him to review and sign the agreement.

10. Bullion Shark would not have continued Matthew's employment if he did not sign contract as the employment agreement contained restrictive covenants that were designed to protect Bullion Shark's trade secrets.

11. On January 11, 2022, Matthew viewed and signed the employment agreement via the electronic signature function of SignNow. See ECF Docket Entry [18-1](). Specifically, on January 11, 2022 at 14:45:02pm UTC, mattf@bullionsharks.com viewed the agreement and on January 11, 2022 at 14:48:46pm UTC, mattf@bullionsharks.com signed the agreement.

12. As of February 28, 2022, Christina Cappello ("Cappello") had access to Bullion Shark's email, christinac@bullionsharks.com. Annexed hereto as **Exhibit "B"** is a copy of email correspondence from christinac@bullionsharks.com as of February 28, 2022.

13. On or about February 28, 2022, Cappello was that she was required to sign an employment agreement with Bullion Shark in order to continue her employment with Bullion Shark.

14. Cappello's employment agreement contained restrictive covenants that were designed to protect Bullion Shark's trade secrets.

15. On February 28, 2022, Cappello viewed and signed the employment agreement via the electronic signature function from SignNow. See ECF Docket Entry 18-2. Specifically, on February 28, 2022 at 13:56:35pm UTC, christinac@bullionsharks.com viewed the agreement and on February 28, 2022 at 13:58:59pm UTC, christinac@bullionsharks.com signed the agreement.

16. After Matthew began his employment with Bullion Shark, he stated that his brother, Jacob Forman ("Jacob"), was looking for work and that Jacob might be a good fit for Bullion Shark.

17. Due to Jacob being under eighteen (18) at the time of hire, Bullion Shark required that he provide work papers to Bullion Shark.

18. As such, Jacob provided work papers to Bullion Shark, which Jacob physically signed. Annexed hereto as **Exhibit "C"** is a copy of Jacob's work papers.

19. A comparison of Jacob's signature on his employment agreement with Jacob's signature on his work papers show an identical signature. See ECF Docket Entry 18-3; compare with Exhibit "C".

20.     Upon learning of Defendants' argument that they legitimately obtained leads from SalesLeads.TV Inc. ("Sales Leads"), I immediately contacted John Fisher ("Fisher"), the owner of Sales Leads.

21.     I stated to Fisher that we had employees who separated from employment with Bullion Shark and were contacting Bullion Shark's customers.

22.     I further informed Fisher that Defendants claimed that they bought leads from Sales Leads, citing the same as a legitimate source of Bullion Shark's customer contact information.

23.     I informed Fisher that I wanted to cross-check the list that Sales Leads had sold to Matthew with Bullion Shark's qualified leads and existing customers list and asked Fisher if he would be able to sell me the same list that he sold to Matthew.

24.     Fisher agreed to do so, and put me in contact with Addy Angarano ("Angarano"), an employee of Sales Leads.

25.     Angarano then pulled up the invoices for the leads lists that Sales Leads sold to Matthew to confirm which lists were sold to Matthew.

26.     Sales Leads sold one batch of leads to Matthew for $1,000 and a second batch of leads to Matthew for $2,000, for a total of $3,000. See ECF Docket Entry 20.

27.     Thereafter, I paid Sales Leads $3,000 for the identical batch of leads that it sold to Matthew. Annexed hereto as **Exhibit "D"** is a copy of the invoice from Sales Leads for the "dupe" list.

28.     Upon receipt of the identical batch of leads, I searched for the three customers that were previously identified in Plaintiff's Motion for a Temporary Restraining Order, Preliminary Injunction and Permanent Injunction to determine whether the contact information for Harry Boltz ("Boltz"), Guy Foote ("Foote "), or Mark Joslyn ("Joslyn") was contained within those lists.

Annexed hereto as **Exhibit "E"** is a copy of the leads list that Defendants had purchased from Sales Leads, with the contact information for the leads redacted.

29. Contrary to Defendants' unsworn assertions, the contact information for Boltz, Foote and Joslyn are not contained in the leads list that Defendants purchased from Sales Leads.

30. On or about December 12, 2023, I spoke with a customer of Bullion Shark, Lawrence Bova ("Mr. Bova").

31. He is an existing customer of Bullion Shark and I was calling him to attempt to solicit further business from Mr. Bova.

32. Mr. Bova and his contact information is on Bullion Shark's qualified leads and existing customers list.

33. During my conversation with Mr. Bova, he informed me that he was not buying any coins at this time because he just recently purchased thousands of dollars worth of Morgan Silver Dollars.

34. I inquired from Mr. Bova if he would disclose where he purchased those coins from.

35. He informed me that he purchased the coins from Matthew from Flip a Coin.

36. On December 21, 2022, I spoke with a customer of Bullion Shark, Barry Noble ("Mr. Noble").

37. Mr. Noble is an existing customer of Bullion Shark whose contact information is contained in Bullion Shark's qualified leads and existing customers list.

38. Mr. Noble informed me that someone from Flip a Coin contacts him weekly to attempt to solicit business from him.

39. Moreover, I have learned from other employees at Bullion Shark that other customers from Bullion Shark's qualified leads and existing customers list have been contacted by Flip a Coin to attempt to solicit their business.

40. Specifically, I learned that Damon Rosenauer ("Mr. Rosenauer") and William Baker ("Mr. Baker") have also been contacted by Defendants in order for Defendants to attempt to solicit business from Mr. Rosenauer and Mr. Baker.

41. Notably, the contact information for Mr. Bova, Mr. Noble, Mr. Walker and Mr. Rosenauer are not contained in the Sales Leads list that Defendants claim is where they obtained the contact information for the customers they have been contacting.

42. Moreover, I have been informed by one of Bullion Shark's current employees, Aaron Harouche ("Harouche"), that other existing customers of Bullion Shark have informed him that they have been contacted by Defendants and that they do not know how Defendants obtained their contact information.

43. In fact, John McCrory ("McCrory") and Matthew Alvey ("Alvey") informed Harouche that they believed that Bullion Shark had leaked their contact information to Defendants and had expressed reluctance to continue to do business with Bullion Shark because of their perception that Bullion Shark had leaked their contact information.

44. As such, Bullion Shark's reputation with its customers is at risk due to Defendants' misappropriation of Bullion Shark's qualified leads and existing customers list.

45. Moreover, I searched through the Sales Leads lists for the contact information for John Lafalgio, Paul Shuliga, Michael Perrault, Mark Luke, McCrory and Alvey – those customers which Harouche identified in his declaration – and none of their contact information is contained in the lists.

46. Thus, Defendants' unsworn statement – and only argument – that they obtained the contact information of Bullion Shark's qualified leads and existing customers is demonstrably false and must be rejected by this Court.

47. In fact, the list provided by Sales Leads to Matthew has the contact information for approximately 7,000 leads in the list, yet Defendants continue to solicit the qualified leads and existing customers of Bullion Shark, which Bullion Shark has spent over a million dollars to create and safeguard from improper use.

48. Defendants have every ability to conduct their business in a legitimate manner and instead, choose to misappropriate Bullion Shark's trade secrets in order to illegally conduct business for their benefit and to the detriment of Plaintiff and its employees.

49. Absent a temporary restraining order issued against Defendants, they will continue to misappropriate Bullion Shark's qualified leads and existing customers and continue to tarnish Bullion Shark's reputation with its customers.

50. I respectfully request that this Court grant a temporary restraining order against Defendants, prohibiting them from contacting any of Plaintiff's qualified leads and existing customers list, as well as Plaintiff's employees and vendors, pending the preliminary injunction hearing set for January 23, 2024.

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 22, 2023.

_____
Nicholas Adamo